[No. A119697. First Dist., Div. Three. Oct. 14, 2008.]

JATINDER KULLAR et al., Plaintiffs and Respondents, v.
FOOT LOCKER RETAIL, INC., Defendant and Respondent;
CRYSTAL ECHEVERRIA et al., Objectors and Appellants.

### Counsel

Qualls & Workman, Daniel H. Qualls and Robin G. Workman for Objectors and Appellants.

Scott Cole & Associates and Scott Edward Cole for Plaintiffs and Respondents.

Cook | Roos | Wilbur | Thompson, Tracy Thompson and Kristina H. Shute for Defendant and Respondent.

### Opinion

**POLLAK, J.**—Objector Crystal Echeverria and two other objectors appeal from a judgment approving the terms of a settlement agreement entered in this class action against defendant Foot Locker Retail, Inc. (Foot Locker). They contend the trial court erred in finding the terms of the settlement to be fair, reasonable and adequate without any evidence of the amount to which class members would be entitled if they prevailed in the litigation, and without any basis to evaluate the reasonableness of the agreed recovery. The settlement was reached in arm's-length negotiations between competent counsel with the assistance of an experienced mediator and may well, in fact, be entirely reasonable in view of the strength of the claims and defenses and the cost and risks of further litigation. Nonetheless, we agree with objectors that the court bears the ultimate responsibility to ensure the reasonableness of the settlement terms. Although many factors must be considered in making this determination, and the court is not required to decide the ultimate merits of the class members' claims before approving a proposed settlement, an informed evaluation cannot be made without an understanding of the amount that is in controversy and the realistic range of outcomes of the litigation. It is possible that the data necessary to make such an evaluation in this case was given to the trial court during informal discussions with counsel, but no such information appears in the record. Therefore, we must vacate the order approving the settlement and remand the matter to permit the trial court to reconsider the fairness and adequacy of the settlement in light of such additional information as the parties may present concerning the value of the class members' claims should they prevail in the litigation and the likelihood of their so prevailing.

BACKGROUND

The initial class action complaint was filed in November 2005 by Jatinder Kullar on behalf of all persons employed at any of Foot Locker's California retail locations subsequent to November 23, 2001, who "were required to purchase and wear shoes of a distinctive design or color as a term and condition of their employment" (the uniform class). The complaint alleged that Foot Locker "requires all persons in its employment to purchase shoes of distinctive design or color (either from Foot Locker or other retailers) as a term and condition of their employment," without reimbursement, in violation of various provisions of California law. Kullar alleged that "he was required to spend at least $200.00 on his mandatory work uniforms." The complaint also alleged that "Foot Locker . . . effectively withholds wages in exchange for Foot Locker's products to be worn as a work uniform," in violation of other provisions of the Labor Code. The complaint sought the recovery of "all sums expended on the Foot Locker 'uniform' " as a condition of employment, plus civil penalties and other relief.

In May 2006, Kullar filed a first amended complaint in which he enlarged the scope of his claims. In addition to the original claims, the amended complaint asserted claims on behalf of a "security check class" of employees, those "who were subject to security searches for which they were not compensated and who, as such, have been denied compensation for all hours worked, the legally-mandated minimum wage, and statutorily mandated meal and rest periods." The amended complaint alleged that "Foot Locker has, for years, knowingly failed to adequately compensate [these employees] for all wages earned, including premium (overtime) wages, . . . due under the California Labor Code and applicable California Wage Orders, and has knowingly failed to provide said workers with statutorily mandated meal and rest periods . . . ." The complaint also alleged related violations of the Labor Code, including the failure to promptly pay wages due upon termination of employment and the failure to use and provide accurate time records and statements of the hours worked by each employee. The amended complaint sought the recovery of the security check class members' "loss of earnings, in an amount to be established at trial," "various penalties, in an amount to be established at trial," and other relief.

Foot Locker's answer denied all of the allegations and denied that any member of the putative class had been damaged "in any sum whatsoever," and it asserted 23 affirmative defenses.

In January 2006, before the amended complaint had been filed, Kullar submitted to Foot Locker a set of special interrogatories and a request for the

production of documents relating to the allegations in the original complaint. Foot Locker filed its responses, consisting in large part of objections, on April 21, 2006. None of the discovery requests were directed to the meal period claims or to any of the allegations that were included for the first time in the amended complaint, and Kullar submitted no discovery demands subsequent to filing the amended complaint. Foot Locker deposed Kullar, but plaintiffs apparently took no depositions of Foot Locker officers or employees.[1]

On October 23, 2006, the parties participated in a successful mediation before an experienced mediator, Mark Rudy, Esq., and in the following weeks produced a "stipulation of settlement," which they submitted to the court on January 12, 2007, seeking preliminary approval of the settlement agreement. The attorneys then met informally on several occasions with the equally experienced judge to whom the case had been assigned, Honorable Richard A. Kramer, and in response to comments and suggestions of the court made some changes in the settlement terms and in the proposed mechanics for giving notice to class members and obtaining final approval of the settlement.

As set forth in the amended final stipulation of settlement that was filed on June 5, 2007, which the court preliminarily approved on June 12, 2007, a settlement class was defined to include both the uniform class and the security check class but to exclude various managerial employees and employees who had worked less than 40 hours during the class period between November 23, 2001, and May 25, 2007. The document recited, among many other standard provisions, that class counsel had engaged in adequate discovery, investigation and research,[2] and that class counsel had determined that

---

[1] Objectors assert that Kullar failed to investigate the meal period claims and that this failure is evidenced by the responses he submitted to interrogatories on June 16, 2006. One interrogatory, for example, asked for all facts upon which he based his contention that Foot Locker failed to provide meal and/or rest breaks to him, and another asked for the names of persons with knowledge of those facts. Kullar responded: "Plaintiff lacks first-hand knowledge of what information may or may not be known to third party individuals. Plaintiff believes that the class members, their immediate supervisors, and other representatives of defendant have information responsive to this request. The identities and contact information of these individuals is currently under the exclusive control of defendants. Discovery is ongoing." Objectors later were provided copies of the documents that had been exchanged in discovery between Kullar and Foot Locker. The only documents exchanged relating to the meal period claims appear to be a two-page handwritten record of Kullar's personal meal period breaks and an employee orientation brochure stating company policies and procedures which includes the statement, "Rest breaks and meal periods are scheduled based on business levels, hours worked and applicable state laws."

[2] As in the original stipulation that had been filed on March 12, 2007, the amended final stipulation recited: "Class counsel has conducted discovery and investigation during the prosecution of the action. This discovery and investigation has included, among other things, (a) inspection and analysis of documents and data provided by defendant; (b) analysis of the

the settlement was in the best interests of the class.[3] The stipulation recited that according to Foot Locker's records, there were approximately 16,900 persons in the settlement class,[4] most of whom had been employed for relatively short periods of time,[5] who in the aggregate had worked approximately 12,485,000 hours. Under the terms of the settlement, Foot Locker agreed to pay up to a maximum of $2 million inclusive of all costs, attorney fees and settlement expenses, in settlement of all claims. From this amount,

legal positions taken by defendant; (c) interviews of material witnesses; (d) data and information provided by Foot Locker for purposes of the mediation; (e) analysis of class-wide damage studies; and (f) research of the applicable law with respect to the claims asserted in the action and the potential defenses thereto. [¶] The class representative has vigorously prosecuted this case, and defendant has vigorously contested it. The parties have engaged in sufficient discovery and investigation, both formal and informal, to assess the relative merits of the claims of the class representative and of defendant's defenses to them."

The stipulation contained no further specificity in these regards and was not accompanied by a declaration or legal memorandum that provided any additional details. No "class-wide damage study" was included in the documents filed with the court, nor was there any specification of the materials that had been produced in discovery or of the witnesses who had been interviewed, nor was any discussion provided of the "legal positions" that had been analyzed or were considered to be problematic.

[3] Much of the stipulation recited generalities that would apply in any case. For example: "The discussions between counsel, and the process leading to the mediation in this matter, have been adequate to give the class representative and class counsel a sound understanding of the merits of their position and to evaluate the worth of the claims of the settlement class. This final stipulation was reached after arms-length bargaining by the parties, conducted with the assistance of a highly qualified and widely respected mediator, and after class counsel thoroughly reviewed all available evidence. The discovery conducted in this action, and the information exchanged through the parties' negotiations, are sufficient to assess reliably the merits of the respective parties' positions and to compromise the issues on a fair and equitable basis. [¶] The class representative and class counsel believe that the claims, allegations and contentions asserted in the action have merit. However, the class representative and class counsel recognize and acknowledge the expense and delay of continued lengthy proceedings that would be necessary to prosecute the action against defendant through trial and appeals. Class counsel has taken into account the uncertain outcome and the risk of any litigation, especially in complex actions such as this action, as well as the difficulties and delays inherent in such litigation, and the potential difficulty in maintaining the Action as a class action. Class counsel is also mindful of the inherent problems of proof regarding, and possible defenses to, the claims alleged in the action. Class counsel believes that the class settlement set forth in this final stipulation confers substantial benefits upon the members of the settlement class, and that an independent review of this final stipulation by the court in the approval process will confirm this conclusion. Based on his own independent investigation and evaluation, class counsel has determined that the class settlement set forth in this final stipulation is in the best interests of the class representative and of the settlement class."

[4] Subsequent to the court's preliminary approval of the settlement agreement, Foot Locker filed a declaration stating the class in fact contained 17,966 persons.

[5] According to the stipulation, approximately 14.6 percent of the class members worked for Foot Locker fewer than 80 hours, approximately 33 percent worked fewer than 160 hours, or one month, approximately 52 percent worked fewer than 320 hours, approximately 62 percent worked fewer than 480 hours, approximately 80 percent worked fewer than 1,040 hours, or six months, and approximately 91 percent worked fewer than 2,080 hours, or one year.

the court would be asked to approve attorney fees of $500,000 and an "incentive award" to Kullar of $5,000. After considering the costs of notice and administering the settlement, it was estimated that the net recovery available for class members would be $1,297,709. Class members submitting claim forms are to share this amount based on a formula dependent on the number of hours that the employee worked for Foot Locker during the class period, not to exceed $2 per hour. If the total amount payable to class members submitting claims is less than 75 percent of the net settlement available for distribution, the difference is to be divided half to Equal Rights Advocates[6] and half to Foot Locker. If the total amount payable is between 75 percent and 100 percent of the amount available, the entire unclaimed balance will be retained by Foot Locker.

Under the settlement formula, the stipulation recites, if class members representing 40 percent of the total hours worked submit claims, it is estimated that an employee who had worked for six months would receive approximately $202.50, an employee who had worked for one year would receive approximately $450, and an employee "with the greatest number of hours worked" would receive approximately $2,900. Assuming "an extraordinarily low participation rate," these amounts would be $2,080, $4,160 and $30,024 respectively.

The stipulated agreement recites that for tax purposes, one-third of the settlement payments to class members will be deemed wages (as to which required deductions will be taken and a form W-2 issued), one-third will be deemed penalties, and one-third will be deemed reimbursement for footwear purchases (as to which a form 1099 will be issued).

On March 22, 2007, objector Crystal Echeverria filed in the Alameda County Superior Court another class action against Foot Locker, alleging that Foot Locker failed to pay its California hourly employees compensation for work without meal breaks, and wages due terminated employees, in violation of California law. At a hearing in the San Francisco court on May 25, 2007, seeking preliminary approval of the settlement we now review, Echeverria appeared and first voiced her objections to the proposed settlement. On August 6, following the court's preliminary approval of the settlement, Echeverria filed a written objection, contending, among other things, that the settlement is not fair, adequate and reasonable in that it does not provide

---

[6] Identified as "a nonprofit tax-exempt organization based in San Francisco, California, whose mission is to protect and secure equal rights and economic opportunities for women and girls."

compensation reasonably related to the actual loss sustained by class members, and that class counsel had not conducted sufficient discovery or investigation to determine the extent of the class loss.[7]

On August 22, the objector filed an application seeking leave to depose Foot Locker's most knowledgeable persons concerning Foot Locker's practices with respect to meal period breaks, recordkeeping for meal period breaks, and payment of compensation for missed meal period breaks. Objector also sought the production of Foot Locker records and discovery responses produced in this action, "all documents referring or relating to the final stipulation of settlement," the briefs that the parties had submitted to the mediator, and certain documents identified in the settlement agreement, including an analysis of classwide damage studies.[8] Following a meet and confer session, the court ordered the parties to produce for the objector all materials that had been exchanged in discovery, as they had agreed to do, but denied all of the remaining discovery requests. The court concluded that the "mediation materials" were protected from discovery by the confidentiality provisions of the Evidence Code (see Evid. Code, § 1119),[9] and that the information objector sought by taking depositions was irrelevant because it related either to liability, which "doesn't matter for the settlement," or to the amount of damages. As to the latter, the court explained that if objector learned there were records reflecting meal period breaks, "you would want to see them, and you would want to see them to show the magnitude of the

---

[7] The objection reads in part: "Provisional class counsel failed to conduct reasonable discovery or pre-settlement investigation to determine facts necessary to ascertain the extent of class loss or the reasonableness of the terms of settlement proposed, including facts regarding the extent and rate of Labor Code violations by defendant, the likely or probable range of damages sustained by Echeverria and class members arising from Labor Code violations by defendant, or the existence and nature of records maintained by defendant regarding claimed Labor Code violations."

On August 20, 2007, two additional objectors, represented by the same attorney, filed identical objections. A fourth objector filed and later withdrew an objection.

[8] See footnote 2, *ante.* Objector requested the production of all documents referred to in categories (a), (d) and (e) of the discovery and investigation described in the stipulation of settlement.

[9] Evidence Code section 1119 provides as follows: "Except as otherwise provided in this chapter: [¶] (a) No evidence of anything said or any admission made for the purpose of, in the course of, or pursuant to, a mediation or a mediation consultation is admissible or subject to discovery, and disclosure of the evidence shall not be compelled, in any arbitration, administrative adjudication, civil action, or other noncriminal proceeding in which, pursuant to law, testimony can be compelled to be given. [¶] (b) No writing, as defined in Section 250, that is prepared for the purpose of, in the course of, or pursuant to, a mediation or a mediation consultation, is admissible or subject to discovery, and disclosure of the writing shall not be compelled, in any arbitration, administrative adjudication, civil action, or other noncriminal proceeding in which, pursuant to law, testimony can be compelled to be given. [¶] (c) All communications, negotiations, or settlement discussions by and between participants in the course of a mediation or a mediation consultation shall remain confidential."

problem, and you would want to show that the settlement is not adequate because the practice as shown in their records is too big and they should be paying more money for having done this, and that's exactly what the 7-11 case [*7-Eleven Owners for Fair Franchising v. Southland Corp.* (2000) 85 Cal.App.4th 1135 [102 Cal.Rptr.2d 777]] says I should not be doing at a settlement final approval hearing."

At the hearing on May 25, 2007, seeking preliminary approval of the settlement agreement, class counsel advised the court that under the terms of the settlement class members would recover 30 cents for every hour worked, as compared to less than $1 for every hour worked if the litigation proceeded and the class prevailed on every issue. At the hearing on final approval, counsel for the objector pointed out that the record contains no evidence to support these numbers, and the trial court implicitly agreed.[10] There was no dispute that no formal discovery had been conducted with respect to the value of the meal period claims, although class counsel argued that relevant information had been exchanged informally. The settling parties argued and the court concluded that the evidence that the settlement had been reached at arm's length by capable attorneys before an experienced mediator, that the attorneys represented that meaningful data had been exchanged during the mediation, and that few members of the large class had objected was sufficient to establish the fairness, adequacy and reasonableness of the settlement.

In the words of the trial judge, "it's not a question so much of whether this [evidence] is sufficient to meet the burden here but rather is this evidence of something? I think it is. And then we get to whether or not as part of this we really have to try the case or something akin to it. I'll state for the record, yes, the moving parties have the burden of proof to show that the settlement is fair, adequate and reasonable. . . . [¶] I agree with defense counsel that there is a presumption on a settlement. It's based on a social policy to resolve cases, that if all of the factors present exist there's a presumption that the settlement is fair, adequate and reasonable. . . . [¶] The objector's point is that

---

[10] According to the settlement agreement, the settlement class includes workers who worked a total of 12,485,000 hours within the class period. If each of these workers worked eight hours per day, and if each was denied a proper meal break as class counsel represented he had assumed, and if each earned an average of $8 per hour as class counsel also assumed without any evidentiary support, Foot Locker would be liable for one-hour-pay penalties of $12,485,000. At one point counsel explained, also without evidentiary support, that because of the large number of part-time employees, only 37 percent of the total hours were worked on shifts entitling the employee to a meal break, which on the same unsupported premises would result in a liability of $4,619,450. One-third of the settlement proceeds, or $666,666 gross, was allocated to the meal period claim. No data was presented with respect to the value of the claims to which the remaining two-thirds of the settlement were allocated.

the factor showing the court's evaluation and the lawyer's evaluation of the strength isn't present here. And we run right smack into Evidence Code section 1119. The fact is under that privilege I don't think I could compel the parties to disclose what was exchanged in a mediation, because there is a very strong policy articulated in California . . . to encourage mediation and the ability to freely exchange information. So the question is can I essentially compel that by saying to the lawyers yes, I believe you, that information was exchanged, yes, I believe that it satisfied you, but I need to see it myself and do it independently. There's no case that says that, and I think what I have to do is keep my mind on the burden of proof here. Is there other evidence that this is in fact fair, adequate and reasonable, apart from taking, as I do, the lawyers at face value. [¶] I think the votes of class members who certainly received actual notice is something I can consider. I can also just look at their numbers myself, and take a look at this, now that's a bit spurious, because the $658 is simply a factor of how many people ended up putting in a claim,[11] but I think I can consider that if the rest of the people don't want to put in a claim they don't want to put in a claim. So the result is those people who took the time to put in their claim are getting a decent amount of money, it's certainly fair, adequate and reasonable to them to get $658 on the average. . . . [¶] I put all that together and my bottom line is I think the standards for applying the presumption are demonstrated here somewhat circumstantially, but nonetheless circumstantial evidence is good evidence and the missing piece, which in logic I agree with you, it would perhaps be easier to do this if I saw the actual numbers, but I don't think under Evidence Code section 1119 I can require it either directly by ordering the parties to do it, they could rightfully refuse, or indirectly by saying well, all right, then I won't approve your settlement if you don't waive your mediation privilege. I don't see how I can do that."

The court overruled the objections to the settlement, found the terms to be fair, adequate and reasonable, and approved the settlement. The formal order granting final approval and the judgment were entered on October 11 and objectors filed a timely notice of appeal.

### Discussion

The settling parties rightly emphasize the limited scope of this court's review of the trial court's approval of a class action settlement. Our task is

---

[11] The court was advised that direct notices had been mailed to 17,966 class members, and 2,938 were returned as undeliverable. There were only three objections and 55 class members had opted to exclude themselves from the settlement class. There were 1,763 claims filed, of which 1,462 were determined to be valid prior to the final settlement approval hearing. The average payment to those submitting valid claims would be $658.

not to make an independent determination whether the terms of the settlement are fair, adequate and reasonable, but to determine "only whether the trial court acted within its discretion." (*Wershba v. Apple Computer, Inc.* (2001) 91 Cal.App.4th 224, 235 [110 Cal.Rptr.2d 145].) As observed in *7-Eleven Owners for Fair Franchising v. Southland Corp., supra*, 85 Cal.App.4th at page 1145 (*7-Eleven*), "[g]reat weight is accorded the trial judge's views." "[G]iven that 'so many imponderables enter into the evaluation of a settlement' [citation], an abuse of discretion standard of appellate review is singularly appropriate." (*Id.* at pp. 1166–1167.)

 The well-recognized factors that the trial court should consider in evaluating the reasonableness of a class action settlement agreement include "the strength of plaintiffs' case, the risk, expense, complexity and likely duration of further litigation, the risk of maintaining class action status through trial, the amount offered in settlement, the extent of discovery completed and the stage of the proceedings, the experience and views of counsel, the presence of a governmental participant, and the reaction of the class members to the proposed settlement." (*Dunk v. Ford Motor Co.* (1996) 48 Cal.App.4th 1794, 1801 [56 Cal.Rptr.2d 483] (*Dunk*); see 4 Newberg on Class Actions (4th ed. 2002) §§ 11:41, 11:43, 13:68.) This list "is not exhaustive and should be tailored to each case." (*Dunk*, at p. 1801.) Relying on an earlier edition of Newberg on Class Actions, the court in *Dunk* asserted that "a presumption of fairness exists where: (1) the settlement is reached through arm's-length bargaining; (2) investigation and discovery are sufficient to allow counsel and the court to act intelligently; (3) counsel is experienced in similar litigation; and (4) the percentage of objectors is small." (*Dunk*, at p. 1802.)

 The trial court concluded that the four factors identified in *Dunk* as supporting a presumption of fairness are established here and are sufficient to support a finding that the settlement is fair, adequate and reasonable. Objectors do not dispute the presence of the first, third and fourth factors, but disagree that there was sufficient investigation and discovery to allow counsel or the court to act intelligently. Objectors focus their argument on the meal period claims. Under Labor Code section 226.7, subdivision (b), an employer that fails to provide an employee a required meal period or rest period "shall pay the employee one additional hour of pay at the employee's regular rate of compensation for each work day that the meal or rest period is not provided." As objectors argued to the trial court and reassert before this court, absolutely no discovery was conducted with respect to the claim that class members were not provided meal periods to which they were entitled. No declarations were filed in support of the settlement indicating the nature of the investigation that had been conducted to determine the number of employees that had allegedly been denied meal breaks, the frequency with which the denials had

occurred, or the circumstances surrounding those denials, and no analysis was provided of the factual or legal issues that required resolution to determine the extent of any one-hour-pay penalties to which class members may have been entitled. No time records were produced in discovery nor was the court presented any estimated quantification of the number of one-hour-pay penalties that might be due or any explanation of the factors that were considered in discounting the potential recovery for purposes of settlement.

Class counsel asserted that information had been exchanged informally and during the course of the mediation session, but their declarations provided no specificity. The only specific was the repeated reference in the moving papers to several employee manuals that had been produced stating company policy simply as follows: "Rest breaks and meal periods are scheduled based on business levels, hours worked and applicable state laws." Whatever information may have been exchanged during the mediation, there was nothing before the court to establish the sufficiency of class counsel's investigation other than their assurance that they had seen what they needed to see. The record fails to establish in any meaningful way what investigation counsel conducted or what information they reviewed on which they based their assessment of the strength of the class members' claims, much less does the record contain information sufficient for the court to intelligently evaluate the adequacy of the settlement. Assuming that there is a "presumption" such as *Dunk* asserts, its invocation is not justified by the present record.

■ More fundamentally, neither *Dunk*, *7-Eleven*, nor any other case suggests that the court may determine the adequacy of a class action settlement without independently satisfying itself that the consideration being received for the release of the class members' claims is reasonable in light of the strengths and weaknesses of the claims and the risks of the particular litigation. The court undoubtedly should give considerable weight to the competency and integrity of counsel and the involvement of a neutral mediator in assuring itself that a settlement agreement represents an arm's-length transaction entered without self-dealing or other potential misconduct. While an agreement reached under these circumstances presumably will be fair to all concerned, particularly when few of the affected class members express objections, in the final analysis it is the court that bears the responsibility to ensure that the recovery represents a reasonable compromise, given the magnitude and apparent merit of the claims being released, discounted by the risks and expenses of attempting to establish and collect on those claims by pursuing the litigation. "The court has a fiduciary responsibility as guardians of the rights of the absentee class members when deciding whether to approve a settlement agreement." (4 Newberg on Class Actions, *supra*, § 11:41, p. 118; see *7-Eleven, supra*, 85 Cal.App.4th at p. 1151.) "The courts are supposed to be the guardians of the class." (Dickerson, Class Actions: The Law of 50 States (2008 supp.) § 9.02[2], p. 9-6.)

██ Although "[t]here is usually an initial presumption of fairness when a proposed class settlement . . . was negotiated at arm's length by counsel for the class, . . . it is clear that the court should not give rubber-stamp approval. [Fn. omitted.] Rather, to protect the interests of absent class members, the court must independently and objectively analyze the evidence and circumstances before it in order to determine whether the settlement is in the best interests of those whose claims will be extinguished." (4 Newberg on Class Actions, *supra*, § 11:41, p. 90; see *In re Matzo Food Products Litigation* (D.N.J. 1994) 156 F.R.D. 600, 604.) "To make this determination, the factual record before the . . . court must be sufficiently developed." (*Matzo Food Products Litigation*, at p. 604.) Newberg lists the four factors recognized in *Dunk* to establish an initial presumption of fairness, but continues: "This initial presumption must then withstand the test of the plaintiffs' likelihood of success." (4 Newberg on Class Actions, *supra*, § 11:41, pp. 92–93.) "The proposed settlement cannot be judged without reference to the strength of plaintiffs' claims. 'The most important factor is the strength of the case for plaintiffs on the merits, balanced against the amount offered in settlement.' " (*City of Detroit v. Grinnell Corporation* (2d Cir. 1974) 495 F.2d 448, 455, overruled on other grounds, as recognized by *Chambless v. Masters, Mates & Pilots Pension Plan* (2d Cir. 1989) 885 F.2d 1053, 1058.) The court "must stop short of the detailed and thorough investigation that it would undertake if it were actually trying the case," but nonetheless it "must eschew any rubber stamp approval in favor of an independent evaluation." (*Grinnell Corporation*, at p. 462.)

The California decisions upholding settlements in class actions, including *Dunk* and *7-Eleven*, are fully consonant with this recognition of the court's responsibility. In *Dunk*, the trial court was made aware of the maximum damages that each class member had sustained and the value of the coupons that each class member would receive under the settlement, as well as of the particular issues that the plaintiffs needed to overcome in order to prevail in the litigation. (*Dunk, supra*, 48 Cal.App.4th at p. 1802.) The voluminous record before the court was deemed "ideal for the trial court to make a rational and educated determination the settlement was fair, adequate and reasonable." (*Id.* at p. 1803.) In upholding the trial court's approval of the settlement, the appellate court "h[e]ld that the trial court's scrutiny . . . . , particularly in light of the substantial questions raised and information presented, was adequate to support its conclusion." (*Id.* at p. 1805.)

The evidence of fairness and adequacy presented to the trial court before it approved the settlement in *7-Eleven* was even more extensive. There the objecting parties acknowledged that the settlement was preceded by " 'vigorous, aggressive and exhaustive' discovery" over four and a half years of

litigation (*7-Eleven, supra,* 85 Cal.App.4th at p. 1149). During the course of "three daylong evidentiary hearings" (*id.* at p. 1142), the court was apprised of the details and maximum dollar value of the plaintiffs' various claims, the defenses to those claims, and the manner in which counsel evaluated the strengths of each of the claims. Although criticized by objectors, the court received sworn testimony as to the amounts in controversy and following tentative approval of the settlement the defendant paid $30,000 to defray the cost of hiring an accountant "to test the validity of [defendant's] . . . data by sampling the underlying records, interviewing [defendant's] accounting personnel, and taking related 'due diligence' measures." (*Id.* at p. 1154.) The trial judge reviewed the contract provisions that were in dispute, as well as counsel's evaluation of the merits of the plaintiffs' claims, and expressed " 'serious reservations about whether there have been breaches sufficient even to bring these damages issues into account' " with one "singular" exception. (*Id.* at p. 1151.) The appellate court was satisfied that the trial court had fulfilled its fiduciary duty "to have before it sufficient information to determine if the settlement was fair, adequate, and reasonable." (*Id.* at pp. 1151, 1166–1167; see also, e.g., *Wershba v. Apple Computer, Inc., supra,* 91 Cal.App.4th at p. 245 ["The court must . . . scrutinize the proposed settlement agreement to the extent necessary to ' "reach a reasoned judgment that the agreement is not the product of fraud or overreaching by, or collusion between, the negotiating parties, and that the settlement, taken as a whole, is fair, reasonable and adequate to all concerned." ' "].)

■ Here, the trial court acknowledged that "in logic" it would have been preferable for it to have been presented with data permitting it to review class counsel's evaluation of the sufficiency of the settlement, but felt that this was precluded because the supporting information was exchanged in the course of mediation. We disagree with this conclusion for two reasons.[12] First, the fact that the settlement was reached during mediation to which Evidence Code section 1119 applies does not eliminate the court's obligation to evaluate the terms of the settlement and to ensure that they are fair, adequate and

---

[12] The trial court noted the additional question of whether the confidentiality of communications with class counsel during the mediation extended to members of the class on whose behalf class counsel presumably was acting. The court expressed the view that Evidence Code section 1119 should be deemed to preclude compulsory disclosure of such communications to objecting class members because requiring such disclosure would discourage counsel from speaking candidly during the mediation, contrary to the purpose behind section 1119. We are aware of no reported decision on this point. In view of our other conclusions and because the parties have not addressed the issue in their briefs to this court, we see no need to address it here. For present purposes, we assume the correctness of the trial court's conclusion that objectors are not entitled to demand production of communications and writings protected from compulsory disclosure by section 1119.

reasonable. If some relevant information is subject to a privilege that the court must respect, other data must be provided that will enable the court to make an independent assessment of the adequacy of the settlement terms. Secondly, the fact that communications were made during the mediation and writings prepared for use in the mediation that are inadmissible and not subject to compulsory production does not mean that the underlying data, not otherwise privileged, is also immune from production. (Evid. Code, § 1120 ["Evidence otherwise admissible or subject to discovery outside of a mediation . . . shall not be or become inadmissible or protected from disclosure solely by reason of its introduction or use in a mediation . . . ."]; see *Rojas v. Superior Court* (2004) 33 Cal.4th 407, 417 [15 Cal.Rptr.3d 643, 93 P.3d 260]; *Wimsatt v. Superior Court* (2007) 152 Cal.App.4th 137, 157–158 [61 Cal.Rptr.3d 200].) Foot Locker's payroll records, for example, if relevant to the quantification of the claims being settled, are subject to discovery and may be introduced in opposition to the settlement even if they were disclosed to class counsel during the mediation, and even if class counsel was shown only a summary or analysis of those records that is not itself subject to production because it was prepared for use in the mediation.

■ Thus, we conclude that the trial court's approval of the settlement agreement must be vacated and the matter remanded for further proceedings. On remand, the settling parties should be given the opportunity to supplement their showing in support of the settlement. Objectors should then be permitted to renew their discovery requests, which should not be denied simply because the requested information was disclosed during the mediation leading to the proposed settlement. The trial court need not grant all requests that the objector sees fit to make. Discovery requests that seek particular materials that are properly within the scope of Evidence Code section 1119 should be denied. The court should exercise its normal discretion to weigh the relevance and need for particular materials against the cost and burdens of production. (Code Civ. Proc., § 2017.020; *Greyhound Corp. v. Superior Court* (1961) 56 Cal.2d 355, 378–380 [15 Cal.Rptr. 90, 364 P.2d 266].) Moreover, the trial court should limit discovery in view of the context in which it is being requested. Discovery is required not to prepare the case for trial, but simply to provide sufficient information to permit an intelligent evaluation of the terms on which the case is proposed to be settled. The objecting parties should not be permitted to frustrate the mutual interest of the class members and the defendant to resolve the litigation promptly by conducting extended or unnecessary discovery. The extent of discovery that is appropriate will depend in large part on the extent of the information that the settling parties provide the court to justify the terms of the settlement. If the settling parties have provided a meaningful and substantiated explanation of the manner in

which the factual and legal issues have been evaluated, and there is no reason to believe that significant information has been overlooked, very little in the way of additional discovery may be justified. However, where, as here, the settling parties provide essentially no information to explain, much less to substantiate, their evaluation of the magnitude or potential merit of the claims being settled, objectors should not be denied access to data that reasonably may be expected to shed light on these issues.

Following the opportunity for limited discovery, the trial court should redetermine whether the proposed settlement is fair, adequate and reasonable. The court may and undoubtedly should continue to place reliance on the competence and integrity of counsel, the involvement of a qualified mediator, and the paucity of objectors to the settlement. But the court must also receive and consider enough information about the nature and magnitude of the claims being settled, as well as the impediments to recovery, to make an independent assessment of the reasonableness of the terms to which the parties have agreed. We do not suggest that the court should attempt to decide the merits of the case or to substitute its evaluation of the most appropriate settlement for that of the attorneys. However, as the court does when it approves a settlement as in good faith under Code of Civil Procedure section 877.6, the court must at least satisfy itself that the class settlement is within the "ballpark" of reasonableness. (See *Tech-Bilt, Inc. v. Woodward-Clyde & Associates* (1985) 38 Cal.3d 488, 499–500 [213 Cal.Rptr. 256, 698 P.2d 159].) While the court is not to try the case, it is " 'called upon to consider and weigh the nature of the claim, the possible defenses, the situation of the parties, and *the exercise of business judgment* in determining whether the proposed settlement is reasonable.' " (*City of Detroit v. Grinnell Corporation, supra*, 495 F.2d at p. 462, italics added.) This the court cannot do if it is not provided with basic information about the nature and magnitude of the claims in question and the basis for concluding that the consideration being paid for the release of those claims represents a reasonable compromise.

By remanding we do not suggest that the proposed settlement ultimately may not pass muster. We hold only that the trial court may not finally approve the settlement agreement until provided with sufficient information to assure itself that the terms of the agreement are indeed fair, adequate and reasonable.

## Disposition

The judgment is reversed and the matter is remanded for further proceedings consistent with this opinion. The parties shall bear their respective costs on appeal.

McGuiness, P. J., and Jenkins, J., concurred.