Filed 11/24/14  Credit/Debit Card Tying Cases CA1/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| CREDIT/DEBIT CARD TYING CASES.<br>_____<br><br>RICHARD JOHNS et al.,<br>     Plaintiffs and Respondents,<br>v.<br>VISA U.S.A., INC. et al.,<br>     Defendants and Respondents;<br>JAMES ATTRIDGE et al.,<br>     Objectors and Appellants. | A138984<br><br>JCCP No. 4335<br><br>(San Francisco City & County<br>Super. Ct. No. CGC04-436920)<br><br>ORDER MODIFYING OPINION<br>AND DENYING REHEARING<br>AND REQUEST FOR JUDICIAL<br>NOTICE |

THE COURT:

It is ordered that the opinion filed herein on October 30, 2014, be modified as follows:

1. On page 1, second sentence of the first full paragraph, the word "Richard" is changed to "James" so the sentence reads:

> Objectors' first appeal (the First Appeal) arose from an order approving a settlement agreement (the First Settlement) that effectively, albeit not expressly, released the claims asserted in a separate pending lawsuit filed by one of the Objectors, James Attridge (the Attridge claims).

1

2.  On page 4, third sentence of the first full paragraph, the extra word "that" is deleted so the sentence reads:

> The complaint in the Attridge action alleged that the exclusion policies permitted Visa and MasterCard to charge higher network service fees than would have been possible in a fully competitive environment, and that these fees were passed on to those holders of Visa and MasterCard credit cards who maintained revolving debt balances in the form of higher fees and finance charges.

There is no change in the judgment.  The petition for rehearing and request for judicial notice filed by appellant James Attridge are denied, as is the petition for rehearing filed by appellant and objector Melvin Salveson.

DATED:  _____          _____
                                        RUVOLO, P. J.

Filed 10/30/14  Credit/Debit Card Tying Cases CA1/4 (unmodified version)
**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| CREDIT/DEBIT CARD TYING CASES.<br>_____<br>RICHARD JOHNS et al.,<br>     Plaintiffs and Respondents,<br>v.<br>VISA U.S.A., INC. et al.,<br>     Defendants and Respondents;<br>JAMES ATTRIDGE et al.,<br>     Objectors and Appellants. | A138984<br><br>JCCP No. 4335<br><br>(San Francisco City & County<br>Super. Ct. No. CGC04-436920) |

## I. INTRODUCTION

This appeal brings this coordinated unfair competition class action (the Credit/Debit Card Tying Cases) before this court for the second time, at the behest of essentially the same appellants (Objectors[1]).  Objectors' first appeal (the First Appeal) arose from an order approving a settlement agreement (the First Settlement) that effectively, albeit not expressly, released the claims asserted in a separate pending lawsuit filed by one of the Objectors, Richard Attridge (the Attridge claims).  On January 9, 2012, we filed an unpublished opinion deciding the First Appeal, in which we concluded that the trial judge had "erred in approving the [First] [S]ettlement without considering

---

[1]  The Objectors who filed the present appeal include all those who appeared as objectors on the earlier appeal, plus one additional individual, Tony Buhowski.

1

whether it included adequate compensation for the release of the Attridge claims." (*Credit/Debit Card Tying Cases* (Jan. 9, 2012, A129672) [nonpub. opn.], p. 2] (*Credit/Debit I*).) We therefore "vacate[d] the order approving the [First] [S]ettlement, and remand[ed] the matter to permit the trial court to reconsider the fairness and adequacy of the [First] [S]ettlement in light of the inclusion of the Attridge claims in the release." (*Ibid.*)

On remand, the case was reassigned to a different judge. The parties revised the settlement agreement in minor respects (the Revised Settlement), providing for the same relief as the First Settlement, but now including an express release of the Attridge claims.[2] When the parties submitted the Revised Settlement to the new judge for approval, they supported their request for approval with two supplemental declarations from their expert economist that were not before the first judge when he approved the First Settlement. Over the objections of Objectors, the trial court approved the Revised Settlement. This timely appeal ensued. This time, we affirm the trial court's order.

## II. FACTS AND LITIGATION HISTORY

### A. Factual Background and Federal Litigation

We need not repeat here in full detail the background facts that were discussed at length in our opinion on the First Appeal. (*Credit/Debit I*, *supra* [pp. 3-11].) Briefly, as explained in *U.S. v. Visa U.S.A., Inc.* (2d Cir. 2003) 344 F.3d 229 and *In re Visa Check/Mastermoney Antitrust Litigation* (E.D.N.Y. 2000) 192 F.R.D. 68, defendants Visa and MasterCard were nonprofit joint ventures from their inception until relatively recently.[3] During the relevant time, each was operated by its member banks for the purpose of processing credit and debit card transactions. Many banks are members of

---

[2] The parties to the Revised Settlement are several individual plaintiffs, including lead named plaintiff Richard Johns (Johns), who represent a plaintiff class (Class Plaintiffs), and defendants Visa U.S.A., Inc. (Visa) and MasterCard International Incorporated (MasterCard).

[3] MasterCard became a publicly held company in 2006, and Visa followed suit in 2008. None of the parties argues that these events, in and of themselves, have any relevance to the issues presented by this appeal.

2

both networks. Each network charges fees to its member banks (network service fees) for processing the transactions. The banks pass along these network service fees to the retailers who accept Visa or MasterCard credit or debit cards as payment for goods or services.

For a period of time ending in 2004, Visa and MasterCard maintained two policies that were later alleged to be anticompetitive. First, they prohibited their member banks from issuing American Express or Discover cards (the exclusion policies). Second, they required merchants who accepted their credit cards to accept their debit cards as well (the credit/debit acceptance policies).

In 1996, a group of retail stores sued Visa and MasterCard, alleging that the credit/debit acceptance policies constituted tying arrangements that violated federal antitrust law. A settlement agreement resolving this litigation (the federal credit/debit tying case) was approved by a federal trial court in December 2003, and the order approving the settlement was affirmed in January 2005. (*In re Visa Check/Mastermoney Antitrust Litigation* (E.D.N.Y. 2003) 297 F.Supp.2d 503; *Wal-Mart Stores, Inc. v. Visa U.S.A., Inc.* (2d Cir. 2005) 396 F.3d 96.)

While the federal credit/debit tying case was pending, the federal government filed a civil antitrust enforcement action (the federal exclusion case) against Visa and MasterCard, challenging the exclusion policies. In October 2001, the trial court in the federal exclusion case entered judgment against Visa and MasterCard, holding that the exclusion policies constituted a horizontal restraint on trade. (*U.S. v. Visa U.S.A., Inc.* (S.D.N.Y. 2001) 163 F.Supp.2d 322. In 2003, the judgment was affirmed. (*U.S. v. Visa U.S.A., Inc.*, *supra*, 344 F.3d 229.)

### B. California State Litigation

In January 2000, while the federal credit/debit tying case and the federal exclusion case were both still pending, Johns filed a consumer class action in California state court challenging the credit/debit acceptance policies. After the settlement of the federal credit/debit tying case, other parties filed similar cases in California. These cases centered on allegations that the credit/debit acceptance policies permitted Visa and

3

MasterCard to charge inflated fees to retailers for processing debit card transactions, and that retailers passed the cost of these fees along to consumers in the form of higher prices for goods and services. Eventually, all of these cases were coordinated by the Judicial Council under the rubric of the Credit/Debit Card Tying Cases, and assigned to a coordination trial judge in San Francisco Superior Court. A consolidated amended complaint (the Consolidated Complaint) was filed in the coordinated proceeding on July 12, 2004, and remained the operative complaint thereafter. This appeal, like its predecessor *Credit/Debit I*, *supra*, arises from the settlement of that coordinated proceeding.

While the proceedings coordinated as the Credit/Debit Card Tying Cases were pending, in December 2004, Attridge filed a consumer class action (the Attridge action) in San Francisco Superior Court, asserting what we refer to as the Attridge claims. (*Attridge v. Visa U.S.A. Inc.* (No. CGC 04-436920).) The Attridge claims focused on the exclusion policies, as opposed to the credit/debit tying policies. The complaint in the Attridge action alleged that that the exclusion policies permitted Visa and MasterCard to charge higher network service fees than would have been possible in a fully competitive environment, and that these fees were passed on to those holders of Visa and MasterCard credit cards who maintained revolving debt balances, in the form of higher fees and finance charges.

### C. First Settlement and First Appeal

"In its final form, the [First] [S]ettlement agreement provided that Visa and MasterCard would pay a total of $ 31 million into an escrow fund, from which attorney fees, litigation costs, class representative incentive awards, and administration costs would be paid. The amount remaining was to be distributed to nonprofit organizations selected by the parties and approved by the court, to be used by those organizations for financial literacy education, or other purposes relating to advocacy for children, or the indigent." (*Credit/Debit I*, *supra* [pp. 11-12].)

Objectors appeared at the approval hearing regarding the First Settlement, and argued that the amount to be paid by Visa and MasterCard was inadequate in light of the

4

breadth of the release included in the settlement agreement. When the question was raised whether the release encompassed the Attridge claims in particular, the parties (at the suggestion of the trial court) removed from the draft agreement a provision *expressly* releasing the Attridge claims. When the Objectors argued that the resulting release provisions still *implicitly* included a release of the Attridge claims, the trial court declined to decide the issue. The First Settlement was approved, and Objectors timely filed the First Appeal.

In our opinion on the First Appeal, we held that the Attridge claims were distinct from the claims asserted by the Class Plaintiffs in the Credit/Debit Card Tying Cases. We reasoned that "[t]he two actions involve different instrumentalities of harm—i.e., the credit/debit acceptance policies versus the exclusion policies—and different types of damage—i.e., inflated retail prices charged by merchants to those who purchase goods or services using credit or debit cards, versus inflated fees charged by card-issuer banks to their customers who carry outstanding credit card balances." (*Credit/Debit I*, *supra* [pp. 16-17].)

Our opinion in the First Appeal acknowledged that "there is considerable overlap between the [Class Plaintiffs] in the Credit/Debit Card Tying Cases and the putative class in the Attridge action." (*Credit/Debit I*, *supra* [p. 17].) Nonetheless, we concluded that "if the [First] [S]ettlement includes a release of the Attridge claims, the trial court was obligated to consider whether Class Plaintiffs had adequately represented the interests of Visa and MasterCard customers in their capacity as members of the putative class in the Attridge action before approving the [First] [S]ettlement." (*Id.* [p. 19].) We further concluded that the Attridge claims did, in fact, fall within the scope of the release provisions in the agreement embodying the First Settlement. (*Id.* [pp. 19-22].)

Because the trial court approved the First Settlement without deciding whether or not it included a release of the Attridge claims, the court also did not determine whether the individual representatives of the Class Plaintiffs in the Credit/Debit Card Tying Cases had adequately represented the interests of members of the putative plaintiff class with respect to the Attridge claims. Nor did the court "address the question whether counsel

5

for the Class Plaintiffs, before agreeing to the [First] [S]ettlement, had adequately investigated and assessed the factual and legal strengths and weaknesses of the Attridge claims." (*Credit/Debit I*, *supra* [p. 24].)

For the same reason, in approving the First Settlement, the trial court also did not determine whether the relief it provided was adequate to compensate not only for the "ballpark" value of the claims asserted in the Credit/Debit Card Tying Cases, but also for the "ballpark" value of the Attridge claims. (*Credit/Debit I*, *supra* [pp. 22-24].) We concluded, due to the trial court's failure to make those necessary determinations, that the trial court had abused its discretion in approving the First Settlement.[4] We therefore reversed the resulting judgment, and remanded for further proceedings. (*Id.* [p. 25].)

## D. Proceedings After Remand
### *1. Judicial Reassignment and Revised Settlement*

After this case was remanded following the First Appeal, Attridge filed a challenge, under Code of Civil Procedure section 170.6, to the judge who approved the First Settlement. As a result, on June 4, 2012, the case was reassigned to a different judge.

The parties then engaged in further negotiations, and ultimately agreed upon the terms of the Revised Settlement. Our record on this appeal includes a copy of the agreement documenting the Revised Settlement, redlined to show the differences between that agreement and the one documenting the First Settlement. For the most part, the revisions were technical wording changes that did not signify any substantive difference between the material terms of the two documents. We outline here only the basic terms of the Revised Settlement, and the substantive differences between it and the First Settlement.

---

[4] In light of some of the arguments Objectors have made on appeal, it bears emphasis that our opinion on the First Appeal did *not* hold that the First Settlement *was in fact unreasonable* in light of its release of the Attridge claims. Rather, we held that the trial court abused its discretion in evaluating the reasonableness of the First Settlement *without considering* its release of the Attridge claims.

6

The Revised Settlement, like the First Settlement, obligated Visa and MasterCard to pay a total of $ 31 million into a settlement fund.[5] From this amount, funds had been expended to cover the costs incurred to give notice to the class regarding the First Settlement, and would be expended to give notice of the Revised Settlement. The Revised Settlement permitted the trial court to award up to 30 percent of the $31 million to counsel for the Class Plaintiffs (Class Counsel) for attorney fees and costs, and up to $1,000 to each of the six named class representatives for their efforts in representing the class. The remainder of the settlement fund was to be used to make *cy près* payments to nonprofit organizations for the benefit of the Class Plaintiffs. These provisions of the Revised Settlement were substantively identical to the equivalent provisions of the First Settlement.

The Revised Settlement provided for a second round of notice to the class, to advise class members of the revision of the settlement terms and provide them with another opportunity to opt out. The notice was to be administered by a third party, and supplemented by a website collecting various documents related to the litigation, including our opinion in *Credit/Debit I*.

The most significant difference between the First Settlement and the Revised Settlement was in the language of the release granted to Visa and MasterCard on the part of the Class Plaintiffs. The release in the Revised Settlement, like that in the First Settlement, covered all claims "arising out of or relating in any way to any conduct or failure to act of any Released Party [i.e., Visa and MasterCard and their agents, etc.] alleged or which could have been alleged in the Consolidated Amended Complaint or any amendments thereto prior to August 23, 2010," including any claims based on the

---

[5] While the First Appeal was pending, Visa and MasterCard paid the settlement amount into an escrow account in accordance with the First Settlement. The funds remained in the escrow account pending further proceedings.

conduct alleged in the federal credit/debit tying case or the federal exclusion case.[6]
Unlike the release in the First Settlement, however, the release in the Revised Settlement
expressly included "all claims asserted in *Attridge v. Visa U.S.A., Inc.*" (i.e., the Attridge
action). (Original italics.)

Both the First Settlement and the Revised Settlement obligated the parties' counsel
to seek court approval of the agreement, as required in a class action. In that context, the
Revised Settlement provided that the parties' counsel would seek an order from the trial
court specifically finding that the "Revised Settlement . . . is fair, reasonable, and
adequate in light of the inclusion in the scope of the release of all claims asserted in
*Attridge v. Visa U.S.A., Inc*." (Original italics.)

### 2. Class Notice and Settlement Approval Process

On August 20, 2012, the Class Plaintiffs moved for preliminary approval of the
Revised Settlement. On the same date, Visa and MasterCard filed a memorandum of
points and authorities in support of approval of the settlement, arguing that it was fair and
reasonable even given the inclusion of the Attridge claims in the scope of the release.
Objectors opposed the motion for preliminary approval. On November 20, 2012, the
judge granted the motion for preliminary approval, and ordered a second round of notice
to the class.

Other than Objectors, only 22 persons opted out of the class, in total (18 in
response to the notice of the First Settlement, and 4 in response to the notice of the
Revised Settlement). After the conclusion of the class notice process, Class Counsel filed
a motion for final approval of the Revised Settlement. The trial court held a hearing on
that motion on April 2, 2013.

---

[6] Both the First Settlement and the Revised Settlement enumerate specific types
of claims that are excepted from the scope of the release. They consist of the claims
asserted in two specifically identified pending antitrust cases, and all claims "based upon
a routine individual dispute with the financial institution that issued [to a class member] a
Visa- or MasterCard-branded payment card regarding payment of [that class member's]
personal account statement."

The evidence submitted by the parties and the Objectors in connection with the proceedings for approval of the Revised Settlement was essentially the same as that submitted in connection with the approval of the First Settlement, with two exceptions. First, Attridge submitted evidence in support of his newly asserted contention that the lead firm representing the Class Plaintiffs (the Zelle firm) has a conflict of interest due to its representation of Wells Fargo Bank in other matters, and that the Class Plaintiffs' expert, Dr. Gustavo Bamberger, also has a conflict of interest due to his consulting firm's involvement with the Attridge litigation. Attridge argued that these conflicts precluded counsel and their expert from representing adequately the interests of the Class Plaintiffs. We will summarize this evidence *post*, in connection with our discussion of Objectors' conflict of interest contentions.

Second, the Class Plaintiffs submitted three supplemental declarations from Bamberger, their expert economist.[7] The first supplemental declaration was addressed to the conflict of interest issue, and will be discussed *post*. The second supplemental declaration responded to Attridge's criticisms of the opinions expressed in the first Bamberger declaration regarding the value of the Attridge claims. Similarly, Bamberger's third supplemental declaration responded to Attridge's criticisms of Bamberger's second supplemental declaration.

Taken together, Bamberger's second and third supplemental declarations clarified the basis for several aspects of Bamberger's opinion regarding the value of the Attridge claims. The first Bamberger declaration cast doubt on the validity of Attridge's contention that the exclusion policies enabled Visa and MasterCard to charge inflated network service fees by noting that these network service fees were not reduced after the exclusion policies were eliminated in 2004. In his second supplemental declaration,

---

[7] Class Counsel had previously submitted a declaration from Bamberger (the first Bamberger declaration) in support of their motion for approval of the First Settlement. They resubmitted the first Bamberger declaration in support of their motions for preliminary and final approval of the Revised Settlement.

Bamberger demonstrated that, contrary to Attridge's claim, he did in fact consider pre-2004 data in arriving at this conclusion.

Bamberger's second supplemental declaration also clarified that, contrary to Attridge's contention, he did *not* believe the banking industry was in a position to pass along to consumers the entire impact of increases or reductions in Visa and MasterCard's network fees. Rather, Bamberger's opinion was that because banks set their own rates for finance charges on revolving charge customers, there was likely to be a substantial variation among issuing banks with regard to their ability to allocate network fees to the holders of Visa and MasterCard credit cards issued by that bank. Bamberger's third supplemental declaration rebutted Attridge's argument that Bamberger had based his analysis of Visa and MasterCard's network revenues on the wrong set of financial data.

### 3.  Trial Court's Findings

On April 11, 2013, the trial court entered an order approving the Revised Settlement, supported by a detailed set of findings of fact and determinations (the Findings). At the outset, the Findings noted that although the Consolidated Complaint focused on the allegation that the credit/debit acceptance policies enabled Visa and MasterCard to charge supra-competitive interchange fees that were passed on in the form of higher retail prices, it also included allegations relating to the exclusion policies that were the subject of the Attridge claims. The Findings also noted that in both the Credit/Debit Card Tying Cases and in the Attridge action, the trial courts had dismissed the plaintiffs' claims for damages under the Cartwright Act (Bus. & Prof. Code, § 16700 et seq.), leaving only equitable claims under the Unfair Competition Law (UCL) (Bus. & Prof. Code § 17200). Thus, the only monetary relief available to the plaintiffs in both cases was restitution, as distinct from damages.

The Findings stated that the Revised Settlement was "the result of extensive negotiations between experienced counsel who are highly familiar with the legal and factual issues of this case," and that there was no evidence of collusion of any kind in those negotiations. Before entering into the settlement, Class Counsel and their expert economist, Bamberger, "assessed the potential value of all class claims arising from the

10

facts pleaded in [the] Consolidated Complaint," and "specifically analyzed the potential value of the claims resulting from [Visa and MasterCard's] 'exclusionary' rules," i.e., the Attridge claims. The trial court also found that Class Counsel conducted substantial discovery, including discovery on the exclusion policies, and adequately investigated the factual and legal strength and weaknesses of the plaintiffs' claims, both in the Credit/Debit Card Tying Cases and in the Attridge action.

The court expressly found the amount of the Revised Settlement to be "fair, reasonable and adequate in light of the strengths and weaknesses of Plaintiffs' claims and the risks of this litigation." The court noted that Bamberger conducted an analysis of the amount likely to be recoverable as *restitution*, as opposed to damages, and the court concluded that Bamberger's opinion "constitute[d] substantial and persuasive evidence that if the litigation had continued, it would have been difficult to trace the flow of money from class members to [Visa and MasterCard]," as would be required in order to make out a claim for restitution.

The court also noted the significant risk that Class Counsel would not have been able to obtain an order certifying the plaintiff class, and/or would not have been able to establish liability. In this connection, the court noted that establishing Visa and MasterCard's liability to *consumers* involved "additional obstacles and risks . . . that the national retail business class [in the federal credit/debit tying case] did not face." Indeed, consumer class actions in 22 other jurisdictions had been unable to establish liability for the conduct alleged in the Consolidated Complaint. Thus, given the record as a whole, the court found the $31 million settlement amount to be "fair, reasonable and adequate."

The court went on to find specifically that the inclusion of the Attridge claims in the release did not change its assessment that the Revised Settlement was fair, reasonable and adequate. In reaching this conclusion, the court discounted the opinion of Attridge's economic expert, Andrew Safir, as to the value of the Attridge claims, because "Dr. Safir's declaration provide[d] an opinion only on the *damages* suffered by the putative *Attridge* class" (original italics), and not on the value of *restitution*, the sole remedy available in the Attridge action. Based on uncontroverted evidence, the court

11

found that the allegedly excessive finance charges and fees paid by class members who maintained revolving balances on their credit cards were collected by the issuing banks, rather than by Visa or MasterCard. Thus, the court was persuaded by Bamberger's opinion that "it would be extremely difficult to trace what, if any, of these finance charges ended up in the possession of Visa and MasterCard," and that this difficulty "in tracing money from the pockets of the class members to the accounts of [Visa and MasterCard] would present a major, and likely an insurmountable, difficulty in obtaining any monetary relief on any claim in this case, including the Attridge claims." (Italics omitted.)

The findings also took note of Bamberger's opinion regarding another weakness in the Attridge claims. Bamberger's analysis indicated that the elimination of the exclusion policies in 2004 did not result in a reduction in network service fees. This fact served to undercut one of the factual premises of the Attridge claims, i.e., that the exclusion policies enabled Visa and MasterCard to charge artificially inflated network service fees.

In sum, the court found that Bamberger's opinion as to the "potential value of the class claims asserted in this litigation" was "adequately supported and persuasive," and that Safir's testimony on those points was not persuasive. The court concluded that in light of the questionable value of the Attridge claims, the relief provided by the Revised Settlement was sufficient to compensate the class members not only for the higher retail prices they had allegedly paid as a result of the credit/debit acceptance policies, but also for the inflated finance charges and fees that the Attridge claims alleged consumers with revolving card balances paid as a result of the exclusion policies.

The court found that the other factors relating to the fairness of the Revised Settlement also militated in favor of approving it. Class Counsel were "significantly experienced and highly respected antitrust and UCL litigators" who were "eminently qualified to conduct the litigation," and they "strongly support[ed] the settlement." Further, the class members had reacted positively, in that only 22 had opted out, and only three objections had been filed. The court also approved the proposed *cy près* distribution of the net settlement amount to "a wide range of worthy and deserving non-

12

profit organizations," finding it appropriate because it would benefit the Class Plaintiffs, and "direct distribution to class members would be prohibitively expensive and otherwise impracticable."

The trial court further found it was appropriate to certify a plaintiff class for settlement purposes (the Settlement Class). The court defined the Settlement Class as "consisting of all end-user purchasers in California of retail products or services from businesses that accepted and/or issued [Visa or MasterCard's credit or debit] cards during the class period."[8] The definition of the Settlement Class was objective; there were millions of class members; and common issues predominated for settlement purposes. Even as to members of the Settlement Class who were also members of the putative class in the Attridge action, the interests of the named plaintiffs (the class representatives) were not antagonistic to that of the Settlement Class, because several of the named plaintiffs maintained revolving balances on their credit cards and paid finance charges and interest as a result. Based on that finding, as well as the findings as to the reasonableness of the settlement generally, the trial court found that the named plaintiffs had adequately represented the members of the Settlement Class; that there was no conflict of interest within the Settlement Class; and that there therefore was no reason to certify a separate subclass of persons who paid finance charges on their credit cards.

Several Objectors opposed the settlement on grounds separate from those urged by Attridge. These Objectors argued that the release provisions of the Revised Settlement were overbroad, in that they included other potential consumer claims against Visa and MasterCard, and that the Revised Settlement should not be approved in the absence of evidence about the value of such claims. The trial court noted that Objectors had not described the nature of any such claims, and "fail[ure] to identify any released claims . . . that [did] not arise out of the anticompetitive conduct alleged" in the Credit/Debit Card Tying Cases. For this reason, the court concluded that Objectors had "failed to

---

[8] The court included a more detailed definition of the Settlement Class in its order approving the Revised Settlement. The details of the definition are not relevant to the issues posed by this appeal.

13

persuasively show that those hypothetical, unspecified claims have any significant value."

## III. DISCUSSION

### A. Applicable Law and Standard of Review

Our opinion on the First Appeal included a discussion of the law regarding the trial court's duty in approving the settlement of a class action. (*Credit/Debit I*, *supra* [pp. 14-15].) We will not repeat that discussion in full here. Suffice it to say that the trial court must " 'ensure that the recovery represents a reasonable compromise, given the magnitude and apparent merit of the claims being released, discounted by the risks and expenses of attempting to establish and collect on those claims by pursuing the litigation.' [Citations.]" (*Id.* [p. 14], citing *Kullar v. Foot Locker Retail, Inc.* (2008) 168 Cal.App.4th 116, 129 (*Kullar*).) "Moreover, if an objector questions the fairness of the settlement based on a difference of opinion with class counsel regarding a 'legal point [which] significantly affects the valuation of the case for settlement purposes,' then 'the trial court is obliged, at a minimum, to determine whether a legitimate controversy exists on [that] legal point.' " (*Credit/Debit I*, *supra* [p. 15], quoting *Clark v. American Residential Services LLC* (2009) 175 Cal.App.4th 785, 803.)

On appeal, however, our standard of review is far more deferential. "Our task is not to make an independent determination whether the terms of the settlement are fair, adequate and reasonable, but to determine 'only whether the trial court acted within its discretion.' [Citation.]" (*Kullar*, *supra*, 168 Cal.App.4th at pp. 127-128; accord, *Munoz v. BCI Coca-Cola Bottling Co. of Los Angeles* (2010) 186 Cal.App.4th 399, 410 (*Munoz*).) In making this determination, "[g]reat weight is accorded the trial judge's views." (*7-Eleven Owners for Fair Franchising v. Southland Corp.* (2000) 85 Cal.App.4th 1135, 1145 (*7-Eleven*); accord, *Munoz*, *supra*, 186 Cal.App.4th at p. 410.) "[G]iven that 'so many imponderables enter into the evaluation of a settlement' [citation], an abuse of discretion standard of appellate review is singularly appropriate." (*7-Eleven*, *supra*, 85 Cal.App.4th at pp. 1166-1167.)

14

Objectors Selvaggio, Metzger, and Buhowski (the Selvaggio Objectors) contend that abuse of discretion is not the sole applicable standard of review, arguing instead that all findings of fact underlying the trial court's determinations must be supported by substantial evidence. In support of this contention, they cite *Kullar*, *supra*, 168 Cal.App.4th at page 133, and cases dealing with Code of Civil Procedure section 877.6 (the good faith settlement statute).

We do not read anything in *Kullar*, *supra*, 168 Cal.App.4th 116, as holding that in assessing the reasonableness of a class action settlement, a trial court is called upon to make any specific factual findings, or that such findings may be challenged on appeal as not supported by substantial evidence. On the contrary, the *Kullar* court stressed only that the trial court "must at least satisfy itself that the class settlement is within the 'ballpark' of reasonableness. [Citation.]" (*Kullar*, *supra*, 168 Cal.App.4th at p. 133.)

In any event, we need not decide this question on the present appeal. To the extent that in the present case, the trial court made factual findings ancillary to its determination that the Revised Settlement is fair and reasonable, the trial court's own detailed explanation of the basis for its rulings, as summarized above, makes clear that there is substantial evidence supporting all such findings. Thus, even if a substantial evidence standard of review applies to any aspect of the trial court's determinations, that standard has been satisfied.

In sum, in reviewing a trial court's approval of a class action settlement, we do not reweigh the evidence, nor do we substitute our notions of fairness for those of the trial court and the parties to the settlement agreement. So long as the record before the trial court was adequate to enable it to reach an intelligent and objective opinion regarding the probabilities of success should the claim be litigated, and to form an educated estimate of the complexity, expense and likely duration of such litigation, as well as all other factors relevant to a full and fair assessment of the wisdom of the proposed compromise, we will not second-guess the trial court's reasonable conclusions on those issues. (*7-Eleven*, *supra*, 85 Cal.App.4th at p. 1145; *Dunk v. Ford Motor Co.* (1996) 48 Cal.App.4th 1794, 1802 (*Dunk*).) Thus, in order to prevail on this appeal, Objectors have the burden to

15

demonstrate that the trial court abused its discretion in approving the settlement. Unless the record demonstrates that the trial court failed to consider all of the relevant facts and legal issues, or that there is no reasonable basis for the court's assessment of the settlement as fair and reasonable, we will affirm.

## B. Analysis

### 1. Alleged Conflicts of Interest

In his opposition to the motion for preliminary approval of the Revised Settlement, Attridge contended that that lead Class Counsel, the Zelle firm, and their expert witness, Bamberger, had conflicts of interest that precluded them from representing adequately the class, and in particular, those class members who held Attridge claims. Specifically, Attridge pointed to the Zelle firm's representation of Wells Fargo Bank, a participating bank in the Visa and MasterCard networks, and to the fact that Attridge's counsel hired another member of Bamberger's consulting firm to perform services in the Attridge litigation.

The trial court rejected Attridge's contentions in its findings of fact. The court acknowledged that the law firm serving as lead Class Counsel also represented Wells Fargo, an issuer of Visa cards, in unrelated matters, and that Wells Fargo had some indemnity obligations to Visa. Nonetheless, the court found that Attridge "failed to present any persuasive evidence" that this representation constituted a conflict of interest, and concluded that Wells Fargo's obligation to indemnify Visa "relate[d] only to the *Attridge* case, [was] purely speculative, and in any event [did] not present a concurrent conflict of interest under California law."

Responding to the charge that Bamberger also had a conflict of interest, Bamberger's first supplemental declaration stated that the Zelle firm retained him as a consultant in this litigation in July 2007. He explained that he did not even know until October 2012 that another member of his firm, in a different office, had been retained in connection with the Attridge litigation. He denied having had any contact with the members of his firm who worked on the Attridge litigation, or any access to any materials related to that litigation other than documents filed with the court.

16

Given this evidence, the trial court also was not persuaded that the involvement of Bamberger's consulting firm in the Attridge action created a conflict of interest for Bamberger, or that Bamberger had received any confidential information relating to the Attridge action.  In addition, the court found that Objectors' delay in raising these issues was "unreasonable and unduly prejudicial."

The section of Attridge's opening brief that addresses this aspect of the trial court's rulings does not reference any evidence in the record that either supports or undercuts the factual basis for his contentions.  The brief cites only federal court docket entries, without any formal request that we take judicial notice of them, and portions of the transcript of the preliminary approval hearing in which Class Counsel argued *against* the claimed conflict.  We could disregard the factual contentions underlying Attridge's argument on that basis alone.  (See *Metis Development LLC v. Bohacek* (2011) 200 Cal.App.4th 679, 683, fn. 1.)

More significantly, Attridge's appellate briefing on this issue utterly fails to address the trial judge's findings on these issues.  Whether the applicable standard of review is abuse of discretion or substantial evidence, an appellate challenge to the trial judge's resolution of the issues cannot proceed, as does Attridge, by simply ignoring the trial judge's factual determinations, and by asking this court to reweigh the evidence.  We decline to do so, and accordingly reject Attridge's conflict of interest contentions for this reason as well.

### 2. Presumption of Fairness

In evaluating a class action settlement, the trial court may apply "a presumption of fairness . . . where: (1) the settlement is reached through arm's-length bargaining; (2) investigation and discovery are sufficient to allow counsel and the court to act intelligently; (3) counsel is experienced in similar litigation; and (4) the percentage of objectors is small.  [Citation.]" (*Dunk*, *supra*, 48 Cal.App.4th at p. 1802.)  If the presumption applies, an objector bears the burden of rebutting it.  (*7-Eleven*, *supra*, 85 Cal.App.4th at p. 1166; *Dunk*, *supra*, at p. 1800.)  On this appeal, the Selvaggio Objectors contend that the presumption is inapplicable here, because the trial court did

17

not analyze the evidence underlying Class Counsel's representations that they had conducted adequate discovery and investigation, as required under *Dunk*.

However, it does not appear that the trial court relied on the presumption of fairness permitted by *Dunk*, *supra*, 48 Cal.App.4th 1794, and similar cases. While addressing all the factors outlined in *Dunk*, the trial court made no reference to applying any presumption as a result of that analysis. Rather, the court took the approach suggested by *Kullar*, *supra*, 168 Cal.App.4th 116, and examined for itself the factual and legal basis for the parties' contentions regarding the fairness and adequacy of the settlement, so as to "independently satisfy[] itself that the consideration being received for the release of the class members' claims [was] reasonable in light of the strengths and weaknesses of the claims and the risks of the particular litigation." (*Id.* at p. 129.) Accordingly, we are not persuaded that the trial court abused its discretion through inappropriate reliance on the *Dunk* presumption.

### 3. Scope of Release

The Selvaggio Objectors, joined by Objector Melvin Salveson, complain that the settlement should not have been approved because it contains an overbroad release, which extends far beyond the specific claims asserted in the Consolidated Complaint and the Attridge claims. They also argue that the trial court proceeded improperly, when it rejected this same contention, by shifting the burden to Objectors to prove the existence and value of any claims potentially included in the release.

Objectors provide no authority to support their contention that in moving for approval of a class action settlement, the parties' counsel are obligated to prove to the trial court that the release included in the settlement agreement leaves untouched the viability of all potential claims by class members other than those expressly pleaded in the relevant complaint. Rather, under the applicable law, a release in a class action settlement may include all claims that were *or could have been* pleaded in the complaint. (*Villacres v. ABM Industries Inc.* (2010) 189 Cal.App.4th 562, 585-586 (*Villacres*).) Indeed, such a release is "common in class action settlements. [Citation.]" (*Carter v. City of Los Angeles* (2014) 224 Cal.App.4th 808, 820.)

18

In seeking judicial approval of a class action settlement, the parties are only obligated to provide the court with sufficient information to enable the court to determine whether the overall settlement terms, including the scope of the release, fall within the "ballpark" of fairness. (Cf., e.g., *Munoz*, *supra*, 186 Cal.App.4th at p. 411 [breadth of release in class action settlement was not improper, where defendant gave class members adequate consideration in return].) If a class action settlement could not be approved unless the parties affirmatively established the nonexistence and/or lack of value of any hypothetical claims potentially covered by the release, it is doubtful that any consumer class action affecting a large class, such as the one in the present case, could ever be settled. Thus, if objecting parties believe the settlement is unfair because it includes an overly broad release provision, it is only logical to require those parties to identify the inappropriately released claims with reasonable specificity, and provide at least some evidence of their viability and value.

For example, Salveson contends that the release "immunizes [Visa and MasterCard] from any anticompetitive conduct from the administration of Jimmy Carter to the administration of President Obama." This rhetorical hyperbole ignores the undisputed fact that Visa and MasterCard abolished their exclusion and credit/debit acceptance policies in 2004, and thus that any new litigation based on those policies would likely be barred by applicable statutes of limitation. Salveson's argument also ignores the fact that the res judicata effect of the judgment in the federal exclusion case, coupled with the equivalent effect of the settlement agreement governing the federal credit/debit tying case, would bar many claims based on the same factual predicate as those cases. (See *Villacres*, *supra*, 189 Cal.App.4th at p. 577 [res judicata applies to court-approved settlement agreement in class action dismissed with prejudice].) Indeed, Salveson's brief does not identify any specific claim precluded by the release clause in the Revised Settlement that could otherwise remain viable despite all of those obstacles.

In objecting to the First Settlement, Attridge came forward with evidence of specific pending claims, already in litigation, that would be barred by the release, and provided the trial court with evidence, in the form of Safir's declaration, regarding the

19

potential value of those claims.  It was on that basis that we concluded, in our opinion on the First Appeal, that the trial court had abused its discretion in declining to consider whether the settlement was adequate to compensate for the release of the Attridge claims.

In contrast, Salveson and the Selvaggio Objectors have not set forth the legal and factual basis for any specific claim that will be improperly barred by the release; have not attempted to establish that any such claim could give rise to a legally and procedurally viable cause of action; and have not provided any evidence of the value of any such claim for litigation purposes.  In the absence of such a showing, we are not persuaded that the trial court abused its discretion in approving the Revised Settlement, notwithstanding the breadth of its release provisions.

### 4.  *Failure to Certify an Attridge Subclass*

As already noted, the trial judge declined to certify a subclass consisting of those class members who held potential Attridge claims, because they had paid interest or finance charges on revolving credit card balances.  The court reasoned that because several of the individual class representatives met that description, and the relief granted under the terms of the Revised Settlement would affect all class members equally, there was no intra-class conflict requiring the certification of a subclass for settlement purposes.  On appeal, Attridge contends this was an abuse of discretion.

Even for settlement purposes, "subclasses are only necessary when members of the class have divergent interests . . . ." (*In re Insurance Brokerage Antitrust Litigation* (3d Cir. 2009) 579 F.3d 241, 272 (*Insurance Brokerage*).)  For example, in *Insurance Brokerage*, the Third Circuit upheld the trial court's refusal to create subclasses for purposes of an antitrust class action settlement, even though the relief in that case "varied among the different groups of class members," in that the settlement "fund was allocated in such a way that a greater percentage of the settlement value is designated for class members who purchased excess insurance during certain years." (*Ibid.*)  Because the allocation was "simply a reflection of the extent of the injury that certain class members incurred," it did not "clearly suggest that the class members had antagonistic interests." Moreover, as in the present case, many members of the settlement class were members of

20

both subgroups that the objectors asserted should have been certified as subclasses. (*Ibid.*) Thus, the trial court did not abuse its discretion in deciding not to certify separate subclasses or require separate representation of different groups of class members. (*Id.* at p. 273; see also *In re Deutsche Telekom AG Securities Litigation* (S.D.N.Y. 2002) 229 F.Supp.2d 277, 283 [where securities class action plaintiffs' claims arose out of common core of facts and legal issues, dealt with overlapping or intertwined defendants, and attacked various aspects of uniform course of conduct involving dissemination of allegedly false and misleading information, certification of subclasses was unnecessary at initial class certification stage].)

In the present case, because the Revised Settlement (like the First Settlement) calls for a *cy près* distribution of the monetary relief awarded to the Class Plaintiffs, its provisions will be of equal benefit (enjoyed equally indirectly) to all members of the settlement class, including those who hold potential Attridge claims. Thus, there is no potential conflict within the class regarding the allocation of the relief provided under the terms of the settlement.

Attridge contends that an adequate analysis would have disclosed that the holders of Attridge claims suffered identifiable damages in an amount sufficient to justify the award of monetary damages to each class member. Thus, he argues, an Attridge subclass should have been certified in order to enable the subclass members to pursue monetary damages that were not available to the broader class under the terms of the Revised Settlement. However, the trial judge reasonably concluded, based on the legal analysis, evidence, and expert opinion presented by Class Counsel, that holders of potential Attridge claims would be limited to restitution, rather than damages, as a remedy, and that it would be impracticable to trace into the hands of Visa and MasterCard the allegedly inflated finance charges that holders of Attridge claims had paid to issuing banks. For these reasons, we are not persuaded that the trial judge abused his discretion in declining to certify a subclass in order to enable the holders of Attridge claims to pursue direct monetary relief.

21

### 5. *Valuation of Attridge Claims*

As they did on the First Appeal, Objectors (particularly Attridge) contend that the trial court erred in finding that Class Counsel had adequately considered value the Attridge claims before agreeing to the Revised Settlement. In that respect, there is a crucial difference between the record on the First Appeal and the record we have before us now.

When the First Settlement was approved, the trial judge declined to determine whether it included a release of the Attridge claims, and thus failed to make any determination whether the terms of the settlement adequately compensated for such a release. In contrast, the Revised Settlement makes the release of the Attridge claims explicit, and when Class Counsel moved for approval of the Revised Settlement, they expressly addressed this issue. Class Counsel represented to the trial court that in their view, the compensation to the class was adequate to reflect the value of the plaintiffs' claims, *including* the Attridge claims. Moreover, the trial court expressly discussed the value of the Attridge claims, and took that value into account, when determining whether the Revised Settlement was fair and adequate.

Moreover, before the trial court entered its order finally approving the Revised Settlement, the Class Plaintiffs' economics expert, Bamberger, filed two supplemental declarations responding to Attridge's criticisms of his opinion regarding the value of the Attridge claims, and clarifying the basis for his disagreement with Attridge's expert, Safir, on that question. In these declarations, Bamberger explained the difficulty the plaintiffs in the exclusion case would have in proving that Visa and MasterCard directly benefited from any overpayments made to network banks before the exclusion practice ended in 2004. As importantly, Bamberger clarified that these difficulties in proof were highlighted by the fact that network service fees did not decrease after 2004, and indeed in some instances the revenues from service fees actually increased as a percentage of purchase volume in subsequent years.

The supplemental Bamberger declarations, which the trial court expressly found persuasive, were not before the trial court when it approved the First Settlement.

Objectors did not counter Bamberger's supplemental declaration with any additional expert opinion; rather, they continued to rely on the declaration by their expert, Safir, that had been filed in 2009 in connection with the approval of the First Settlement.

Despite the additional evidence and the trial court findings, Objectors' briefs on the present appeal argue that Bamberger's evaluation of the Attridge claims was erroneous. They also argue that in negotiating the Revised Settlement, Class Counsel did not adequately represent the interests of holders of Attridge claims, and in particular, failed to make an adequate investigation and evaluation of those claims. In so arguing, however, Objectors address the wrong question.

The issue before us on this appeal is not whether Safir's opinion is superior to Bamberger's, or whether Class Counsel should have done more investigation into the value of the Attridge claims. The issue is whether the trial court abused its discretion in determining that the Revised Settlement was adequate in light of the overall value of the claims it encompassed, including the Attridge claims. As we have set forth earlier in this opinion, the record makes clear that before approving the Revised Settlement, the trial court carefully considered Attridge's arguments about the value of the Attridge claims, and ultimately rejected them. The trial court's findings on this issue are supported by substantial evidence, including, but not limited to, Bamberger's supplemental declarations. Accordingly, in light of the evidence and the record as a whole, Objectors have not persuaded us that the trial court abused its discretion in finding that the Revised Settlement was fair and reasonable.

## IV. DISPOSITION

The judgment is affirmed. In the interests of justice, all parties shall bear their own costs on appeal.

23

_____
RUVOLO, P. J.


We concur:


_____
MARGULIES, J.*


_____
RIVERA, J.

* Associate Justice of the Court of Appeal, First Appellate District, Division One, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.