Filed 9/18/24  Hajny v. Volkswagen Group of America CA1/1
**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| JOHN HAJNY et al., <br><br> Plaintiffs and Respondents, <br> v. <br> VOLKSWAGEN GROUP OF AMERICA, INC., et al., <br><br> Defendants and Respondents; <br> AMY WYNNE, <br><br> Movant and Appellant. | A166931, A168736 <br><br> (Contra Costa County <br> Super. Ct. No. C22-01841) |

In this consolidated appeal, Amy Wynne, a class member and objector, challenges the trial court's approval of a settlement that resolved class claims against defendants Volkswagen Group of America, Inc. (Volkswagen), Audi of America LLC (Audi), and Sanctus LLC d/b/a Shift Digital (Shift Digital) (collectively, defendants) arising from a data breach, in which consumers' personal information was allegedly stolen by hackers.  Wynne claims the court erred when it granted final approval of the settlement and denied her motion to vacate the resulting judgment because it lacked sufficient information to make an informed evaluation of the fairness of the settlement. She also claims the court erred when it denied her motion to intervene.  We disagree and affirm.

1

# I.  BACKGROUND

## A. *The Lawsuits Filed Against Defendants*

Volkswagen is a subsidiary of a car manufacturer, and Audi is a trademark of Volkswagen and a luxury car brand.  Shift Digital provided Volkswagen and Audi with marketing and data management services.  The record shows that defendants were sued in three separate class action lawsuits for an alleged data breach affecting approximately 3,177,000 consumers—*Wynne v. Audi of America, LLC* (N.D.Cal. 2021, No. 4:21-cv-08518-DMR) (*Wynne*); *Villalobos v. Volkswagen Group of America, Inc.* (D.N.J. 2021, No. 2:21-cv-13049-JMV-JBC) (*Villalobos*); and *Hajny v. Volkswagen Group of America, Inc.* (D.N.J. 2021, No. 2:21-cv-13442-JMV-JBC) (*Hajny*).

Wynne filed her action in June 2021 in the Superior Court for Marin County, and defendants removed the case to the Northern District of California.  Wynne's complaint asserted a claim for violations of the California Consumer Privacy Act of 2018 (CCPA), Civil Code section 1798.100 et seq.

Shortly after Wynne filed her action, the *Villalobos* and *Hajny* actions were filed in the District of New Jersey and then consolidated as *In Re: Volkswagen Data Incident Litigation* (D.N.J. 2021, No. 4:21-cv-08518) (*Volkswagen*).  In November 2021, the consolidated action was transferred to the Northern District of California, where *Wynne* was pending.  The *Volkswagen* plaintiffs (hereafter referred to as plaintiffs) filed a consolidated complaint asserting 11 causes of action, including negligence, breach of confidence, and violation of the CCPA.

The parties in the *Wynne* and *Volkswagen* actions agreed to mediation to discuss a possible global settlement.  Prior to the mediation, the parties

engaged in informal discovery. Defendants produced numerous documents, including a description of the data breach and documents showing the number of individuals whose personal information was exposed in the data breach and the type of information that was exposed.

The mediation commenced in May 2022 before an experienced and neutral mediator. During the first day, Wynne's counsel left before the mediation concluded. Wynne did not participate in any further settlement discussions. A few days later, plaintiffs agreed to a settlement in principle for the *Volkswagen* action, and after several weeks of "arms'-length" negotiations, the parties executed a term sheet setting forth the material terms of the settlement agreement. Plaintiffs informed the Northern District of California that they would be seeking approval of the settlement in state court.

In August 2022, plaintiffs dismissed their federal action and filed a class action complaint in the Superior Court of Contra Costa County. The complaint alleged that as a result of defendants' failure to properly secure its customers and prospective customers' personally identifiable information, computer hackers were able to steal "personal information" (PI) and/or "sensitive personal information" (SPI) for over 3 million people. The complaint defined PI as information that could be used to identify or locate a person; it did not include SPI, which referred to driver's license numbers, social security numbers, bank information, dates of birth, or tax identification numbers.

The complaint identified a " 'Nationwide Class' " of " '[a]ll persons residing in the United States whose PI and/or SPI . . . was compromised in the Data Breach.' " It also identified a " 'California Subclass,' " consisting of " '[a]ll persons residing in the State of California whose PI and/or SPI . . . was

3

compromised in the Data Breach.' " On behalf of the nationwide class, the complaint asserted negligence, breach of implied contract, and breach of contract causes of action. For the California subclass, the complaint alleged violations of the CCPA and California's unfair competition law (Bus. & Prof. Code, § 17200 et seq.).

## B. The Volkswagen *Settlement and Motion for Preliminary Approval*

Approximately two weeks after plaintiffs filed their complaint in state court, they filed a motion seeking class certification and preliminary approval of a nationwide settlement. In support, plaintiffs provided declarations and a memorandum explaining how they valued the claims.[1]

Pursuant to the settlement agreement, defendants agreed to pay $3.5 million to settle the case. The settlement funds were to be allocated across three "tiers," each of which corresponded to a particular subclass. "Tier 1" (or the "California SPI Subclass") encompassed California residents whose SPI was exposed in the data breach. $2 million would be allocated to Tier 1. "Tier 2" (or the "Nationwide SPI Subclass") referred to non-California residents whose SPI was exposed in the data breach. $800,000 would be allocated to this tier. Lastly, "Tier 3" (or the "Nationwide PI Subclass") encompassed class members whose PI (but not SPI) was exposed in the data breach. $700,000 would be allocated to Tier 3.

The settlement agreement further provided that the funds allocated to each tier would be reduced "proportionately" by the administration costs and litigation expenses. The remaining funds would be used to provide class members "Cash Payments," or, for SPI subclass members (Tiers 1 and 2), reimbursement for out-of-pocket costs, if any, up to $5,000 per claimant. The

---

[1] We discuss these filings in detail, *infra*, in connection with our discussion of the issues on appeal.

4

amount of the cash payment differed between the subclasses. Subclass members in Tier 1 could submit a claim for a cash payment of $350. Members in Tier 2 could receive a cash payment of $80, and members in Tier 3 could receive $20.

Class counsel explained in a supporting declaration that the "[settlement] award amounts vary by strength of the particular subclass members' claims." The Tier 1 members have alleged a claim under the CCPA, which allows California residents who have had their SPI exposed in a data breach to seek statutory damages up to $750 without having to prove causation and actual damages. (Civ. Code, § 1798.150, subd. (a)(1)(A).) No other state provided similar benefits. The strength of the non-CCPA claims varied by the sensitivity of the data at issue.

To receive compensation, class members would be required to complete and submit a claim form by the claims deadline and, if seeking reimbursement, provide supporting documentation of their out-of-pocket expenses. Once the claims deadline had passed, Tier 1 claimants were to be paid first under the settlement agreement. If the amount of the valid claims exceeded the settlement funds allocated to Tier 1, the payments would be reduced pro rata. If, however, there were funds remaining after all Tier 1 claimants had been paid, the leftover funds would be added to Tier 2. After the Tier 2 claimants were paid, any remaining funds would then be added to Tier 3. Any funds remaining after the Tier 3 claimants were paid would be used to increase pro rata the reimbursement claims "up to 100%" and then all the cash payments.

In addition to monetary compensation, the settlement agreement provided that Shift Digital would take additional measures to secure the personal information within its custody and control.

### C. *Wynne's Attempts to Intervene in the* Volkswagen *Action*

In October 2022, before the court ruled on the motion for preliminary approval, Wynne filed an ex parte application for leave to intervene as a named plaintiff in the *Volkswagen* action.  She lodged a proposed complaint in intervention with her application, in which she asserted a CCPA claim on behalf of California residents whose "personal identifiable information" was stolen in the data breach.

In her application, Wynne argued that she satisfied the requirements for mandatory intervention because she had an interest in the action as an unnamed class member, disposition of the *Volkswagen* action would impair her interest, and the California subclass was not adequately represented by plaintiffs.  In the alternative, Wynne claimed she met the requirements for permissive intervention.

The trial court denied Wynne's application, ordered her complaint in intervention deemed filed as of that date, and set a briefing schedule for Wynne to file a noticed motion to intervene.

Wynne's motion to intervene, filed a few days later, largely reiterated the arguments she made in her ex parte application regarding her right to intervene in the *Volkswagen* action.  She also contended there were several deficiencies in plaintiffs' motion for preliminary approval and the proposed settlement.

The trial court denied Wynne's motion.  It found that while she satisfied the first requirement for mandatory intervention because she had an interest in preserving her claims against defendants, she failed the second prong.  Citing *Edwards v. Heartland Payment Systems, Inc.* (2018) 29 Cal.App.5th 725 (*Edwards*), the court reasoned that Wynne's ability to protect her interest would not be practically impaired or impeded because she

6

could opt out of or object to the settlement. The court also found Wynne's request for permissive intervention unpersuasive because her reason for intervening—to challenge the adequacy of the settlement—did not outweigh the opposition to intervention.

In December 2022, the trial court granted preliminary approval of the proposed settlement. Wynne subsequently appealed the order denying intervention.

### D. Final Approval of Settlement

Wynne did not opt out of the *Volkswagen* settlement and instead objected. As relevant here, she argued that the parties did not explain why the "lopsided" monetary allocation between the three subclasses was rational or fair and why the smallest subclass (Tier 1) would pay 57 percent of the proposed settlement deductions. Citing *Kullar v. Foot Locker Retail, Inc.* (2008) 168 Cal.App.4th 116 (*Kullar*), she further contended the court had insufficient information to make an independent determination of the potential value of the class's non-CCPA claims.

Plaintiffs thereafter moved for final approval of the settlement. In support, they submitted declarations from class counsel and the claims administrator. The declarations noted the claims deadline had passed, and they provided details regarding the number of claims submitted for each tier, whether the claims sought reimbursement or cash payments, and the total amount sought by the reimbursement claimants. Additionally, class counsel noted that only four class members objected to the settlement.

The trial court granted final approval of the settlement, concluding the prerequisites for a class action were satisfied and the settlement was "fair, reasonable, adequate, and in the best interests" of the class.

7

### E. *Wynne's Motion to Vacate*

After the trial court granted final approval, Wynne moved to vacate the final approval order and judgment on the ground that there was an erroneous or incorrect legal basis for the court's decision. (See Code Civ. Proc., § 663.) She again argued that the record was not sufficiently developed to permit the court to make an independent evaluation of the fairness and adequacy of the settlement.

The trial court denied Wynne's motion to vacate, concluding it was "a rehash of a rehash." Wynne appealed the order denying her motion to vacate. We consolidated the appeal with her appeal from the order denying her motion to intervene.

## II. DISCUSSION

Wynne challenges the order and judgment approving the settlement, as well as the order denying her motion to vacate the judgment and the order denying her motion to intervene. We turn to the order denying her motion to intervene first.

### A. *Motion to Intervene*

Wynne contends the trial court erred in denying her motion for mandatory or permissive intervention. We disagree.

#### 1. *Mandatory Intervention*

Code of Civil Procedure section 387, subdivision (d)(1)(B) requires the trial court to permit a nonparty to intervene in an existing action if (1) the nonparty has an interest relating to the property or transaction that is the subject of the action; (2) the nonparty's ability to protect that interest may be impaired or impeded by the disposition of the pending case; and (3) the nonparty's interests are not adequately represented by one or more of the

existing parties. In evaluating these requirements, we may take guidance from federal court decisions. (*Edwards, supra*, 29 Cal.App.5th at p. 732.)

"California cases are not settled on whether we review the denial of a request for mandatory intervention pursuant to [Code of Civil Procedure] section 387 de novo or for abuse of discretion." (*Edwards, supra*, 29 Cal.App.5th at p. 732.) We need not resolve this issue because we find no error in denying mandatory intervention under either standard.

The trial court denied Wynne's motion to intervene because it found that her interest would not be impaired or impeded by the settlement, and thus her motion failed on the second prong. The court relied on *Edwards*, which affirmed the denial of mandatory intervention because the proposed intervenors were class members who could protect their interest in challenging the adequacy of a proposed class settlement by objecting to or opting out of the settlement. (*Edwards, supra*, 29 Cal.App.5th at pp. 733–735.)

Citing federal authority, Wynne claims the trial court erred because *Edwards* was wrongly decided. (See *Technology Training Associates, Inc. v. Buccaneers Limited Partnership* (11th Cir. 2017) 874 F.3d 692, 696; *Smith v. SEECO, Inc.* (8th Cir. 2017) 865 F.3d 1021, 1024–1025.)

We need not decide whether *Edwards* was wrongly decided because even if it was, we affirm based on the third factor: Wynne's interests were adequately represented.[2]

---

[2] That the court failed to indicate this factor as a basis for denying intervention is immaterial since "[w]e do not review the trial court's reasoning, but rather its ruling" (*J.B. Aguerre, Inc. v. American Guarantee & Liability Ins. Co.* (1997) 59 Cal.App.4th 6, 15), and the parties fully briefed the third factor in the trial court and on appeal.

To determine whether an interest was adequately represented, the court considers three factors: " '(1) whether the interest of a present party is such that it will undoubtedly make all of a proposed intervenor's arguments; (2) whether the present party is capable and willing to make such arguments; and (3) whether a proposed intervenor would offer any necessary elements to the proceeding that other parties would neglect. [Citation.] [¶] The most important factor in determining the adequacy of representation is how the interest compares with the interests of existing parties.' " (*Accurso v. In-N-Out Burgers* (2023) 94 Cal.App.5th 1128, 1138, review granted Nov. 29, 2023, S282173.) Where " 'the applicant's interest is identical to that of one of the present parties, a compelling showing [is] . . . required to demonstrate inadequate representation.' " (*Ibid.*)

Wynne and at least one of the named plaintiffs, Ricardo Villalobos, share identical interests because they seek to obtain damages on behalf of the same group of aggrieved consumers under the CCPA. (See *Callahan v. Brookdale Senior Living Communities, Inc.* (9th Cir. 2022) 42 F.4th 1013, 1021 [interests identical where party and nonparty seek the same litigation outcome].) Thus, Wynne was required to make a " 'compelling showing' " to demonstrate inadequate representation.[3] (*Accurso v. In-N-Out Burgers, supra*, 94 Cal.App.5th at p. 1138, review granted Nov. 29, 2023, S282173.) She failed to do so. She did not address Villalobos's ability and willingness to adequately represent her interests as a member of the California subclass.

---

[3] Even if the "compelling showing" standard did not apply, as Wynne suggests, she did not otherwise make the minimal showing required because, as we will explain, her contentions are not legally or factually supported. (See *Trbovich v. Mine Workers* (1972) 404 U.S. 528, 538, fn. 10 [standard for establishing inadequate representation where parties' interests are not identical].)

Nor did she show that she would offer necessary elements to the proceedings that Villalobos would otherwise neglect. She notes some things she would have done differently in litigating the case, but her disagreement with plaintiffs' legal tactics or litigation strategy does not establish inadequate representation. (*Callahan,* at p. 1021.)

Wynne essentially makes two arguments for why she believes plaintiffs—which presumably includes Villalobos—inadequately represented her. First, citing *Koike v. Starbucks Corp.* (N.D.Cal. 2009) 602 F.Supp.2d 1158 (*Koike*), she argues plaintiffs cannot represent her interests because they agreed to release their claims against defendants as part of the settlement. *Koike* is distinguishable, however, because prior to the class member's motion to intervene in that case, the court denied class certification, and the putative class representatives settled their individual claims with the defendant. (*Id.* at p. 1159.) In granting the motion to intervene, the court concluded that the class representatives could not adequately represent the class member's interest in pursuing a class action because they had agreed as part of their individual settlements not to appeal the class certification decision. (*Id.* at p. 1161.) Thus, it was apparent in *Koike* that the class representatives were incapable of representing the class member's interests. Wynne did not make a similar showing here.

Second, Wynne contends her interests were inadequately represented because plaintiffs simultaneously represented a nationwide subclass and a California subclass. She argues there is a " 'baked-in' conflict of interest" between the two subclasses because the California subclass members have stronger claims than the nationwide subclass members. However, " 'the idiosyncratic differences between state consumer protection laws' " alone do not establish a conflict of interest. (*Wershba v. Apple Computer, Inc.* (2001)

11

91 Cal.App.4th 224, 244, disapproved of on another ground by *Hernandez v. Restoration Hardware, Inc.* (2018) 4 Cal.5th 260, 269–270; see *Dunk v. Ford Motor Co.* (1996) 48 Cal.App.4th 1794, 1806.) " ' "Only a conflict that goes to the very subject matter of the litigation will defeat a party's claim of representative status." ' " (*Wershba*, at p. 238.) Wynne does not point to any irreconcilable conflict on the part of plaintiffs to maximize recovery for all class members. Indeed, they all suffered a common alleged wrong because their personal information was stolen after defendants failed to adequately secure it. (See *id.* at pp. 238–239.) And again, Wynne ignores the fact that Villalobos sought to specifically represent the California subclass.

Wynne's second argument rests on the unfounded assertion that the California subclass members' claims were diluted to fund the nationwide claims. According to Wynne, the settlement is structured such that the funds allocated to the California subclass would be "looted" to fund the nationwide claims. To the contrary, the settlement agreement allocates a specific amount to each tier that would not be used to compensate class members from other tiers until all claimants from that particular tier were fully compensated.

Wynne clarifies in her reply that because plaintiffs did not assign any specific value to the nationwide claims, the settlement fund must have been based "entirely and exclusively" on the value of the CCPA claims, leading to a dilution of the California claims. However, there does not need to be an express statement of the maximum potential value of the claims. (*Munoz v. BCI Coca-Cola Bottling Co. of Los Angeles* (2010) 186 Cal.App.4th 399, 408–409 (*Munoz*).) Wynne has not directed us to any facts or law which would require us to conclude the California class members received less in the settlement because of the inclusion of non-California residents in the class.

12

The settlement is not a zero-sum situation in which a gain for one subclass necessarily leads to a loss to another subclass.

Wynne's authority is inapposite. In *Lubocki v. ZipRealty, Inc.* (C.D.Cal. Mar. 10, 2009, No. CV 07-02959 SJO (JCx)) 2009 U.S.Dist. Lexis 153488, unnamed class members sought to intervene after class counsel misappropriated settlement funds before those class members received any of their settlement proceeds. (*Id.* at pp. *4–8.) The district court granted the request because the existing parties potentially would not adequately represent the interests of the unnamed class members. (*Id.* at pp. *20–21.) "Given that these plaintiffs have received some or all of their funds, they may be less inclined to make arguments on behalf of the Class or take an active role in the litigation to represent the interests of those class members who have not received any funds." (*Id.* at p. *21.) In contrast, there is no indication here that plaintiffs would not be incentivized to advocate for all class members.

In *Stone v. First Union Corp.* (11th Cir. 2004) 371 F.3d 1305 (*Stone*), a former employee of the defendant bank brought a class action lawsuit alleging that the bank had a policy that violated the Age Discrimination in Employment Act (ADEA), 29 U.S.C.S. § 621 et seq. (*Stone*, at p. 1310.) The district court initially granted class certification but later decertified the class. (*Id.* at p. 1307.) The Eleventh Circuit reversed the district court's denial of the former class members' motion to intervene because any ruling on whether the bank's policy violated the ADEA "would have significant persuasive effects" on other cases, and the former class members' interests might be different than the plaintiff's interests. (*Stone*, at pp. 1310, 1312.)

In *Stone*, the former class members would not have been represented absent intervention because the district court had decertified the class, which

is not the situation here.  (*Stone, supra*, 371 F.3d at p. 1307.)  Moreover, the former class members and the named plaintiff did "not have sufficiently similar claims against the bank."  (*Id.* at p. 1312.)  But in this case, Villalobos and Wynne seek to bring the same claim on behalf of the same group of consumers.

Finally, the "limited fund" cases Wynne cites in her reply are distinguishable because there was evidence in those cases that the defendants' assets and insurance would be insufficient to satisfy an alleged liability to multiple sets of claimants.  (See, e.g., *Sullivan v. Chase Investment Services, Inc.* (N.D.Cal. 1978) 79 F.R.D. 246, 258; *In re Cardinal Health, Inc. ERISA Litigation* (S.D.Ohio 2005) 225 F.R.D. 552, 557.)  No such evidence was presented here.

We therefore conclude the trial court did not err in denying mandatory intervention.

### 2. *Permissive Intervention*

For permissive intervention, Wynne must show:  "(1) the proper procedures have been followed; (2) the nonparty has a direct and immediate interest in the action; (3) the intervention will not enlarge the issues in the litigation; and (4) the reasons for the intervention outweigh any opposition by the parties presently in the action."  (*Reliance Insurance Co. v. Superior Court* (2000) 84 Cal.App.4th 383, 386; Code Civ. Proc., § 387, subd. (d)(2).)  We review the trial court's denial of an application for permissive intervention for an abuse of discretion.  (*Reliance*, at p. 386.)  In conducting our review, we presume the trial court followed the law, and any ambiguities in the court's ruling are resolved in favor of affirmance.  (*Denham v. Superior Court* (1970) 2 Cal.3d 557, 564.)

14

The trial court denied permissive intervention because it reasonably found that Wynne's "reasons for intervention did not outweigh Defendants' and the non-moving Plaintiffs' opposition thereto in light of her right to object or opt out." Defendants opposed intervention because it would delay resolution of plaintiffs' claims and derail the settlement. They argued that Wynne's reasons for intervention—to challenge the adequacy of the settlement—did not outweigh the reasons against intervention because she could object to the settlement or opt out of it. Plaintiffs opposed intervention because Wynne's position on the merits was duplicative of plaintiffs' position, and she was adequately represented.

Wynne ignores the trial court's express findings regarding the fourth prong of the permissive intervention analysis, contending the court committed legal error by not balancing her interests against the interests of the other parties. She reaches this conclusion based on the order's reference to her ability to opt out of or object to the settlement. But by noting that Wynne could object to or opt out of the settlement, the court implicitly found that intervention was unnecessary for the reasons stated in the opposition, and thus the reasons against intervention outweighed Wynne's reasons for intervention. The court did not abuse its discretion in denying permissive intervention. (See *State Water Bd. Cases* (2023) 97 Cal.App.5th 1035, 1050 [holding that "courts may consider whether intervention would be unnecessary, duplicative, or redundant when denying a motion to permissively intervene"]; *South Coast Air Quality Management Dist. v. City of Los Angeles* (2021) 71 Cal.App.5th 314, 320 [affirming denial of permissive intervention because proposed intervenor's position on the merits was duplicative].)

15

**B. Approval of Settlement**

Wynne argues the trial court erred by granting final approval of the settlement and by denying her motion to vacate the resulting judgment. Her primary contention is that the factual record below was not sufficiently developed to permit the court to independently assess the settlement's fairness. We conclude otherwise.

### 1. *Judicial Review of Class Action Settlements*

Trial court approval of a class action settlement is required because the court has a fiduciary responsibility as guardian of the rights of the absentee class members. (*Kullar, supra*, 168 Cal.App.4th at p. 129.) "[I]n the final analysis it is the court that bears the responsibility to ensure that the recovery represents a reasonable compromise, given the magnitude and apparent merit of the claims being released, discounted by the risks and expenses of attempting to establish and collect on those claims by pursuing the litigation." (*Ibid.*)

"The well-recognized factors that the trial court should consider in evaluating the reasonableness of a class action settlement agreement include 'the strength of plaintiffs' case, the risk, expense, complexity and likely duration of further litigation, the risk of maintaining class action status through trial, the amount offered in settlement, the extent of discovery completed and stage of the proceedings, the experience and views of counsel, the presence of a governmental participant, and the reaction of the class members to the proposed settlement.' [Citations.] This list 'is not exhaustive and should be tailored to each case.' " (*Kullar, supra*, 168 Cal.App.4th at p. 128.)

A "presumption of fairness exists where: (1) the settlement is reached through arm's-length bargaining; (2) investigation and discovery are

16

sufficient to allow counsel and the court to act intelligently; (3) counsel is experienced in similar litigation; and (4) the percentage of objectors is small." (*Dunk v. Ford Motor Co., supra*, 48 Cal.App.4th at p. 1802.) Even when the factors supporting a presumption of fairness are present, however, a court cannot "determine the adequacy of a class action settlement without independently satisfying itself that the consideration being received for the release of the class members' claims is reasonable in light of the strengths and weaknesses of the claims and the risks of the particular litigation." (*Kullar, supra*, 168 Cal.App.4th at p. 129.) In other words, courts " 'must eschew any rubber stamp approval in favor of an independent evaluation.' " (*Id.* at p. 130.)

The scope of our review of the trial court's approval of a class action settlement is limited. "Our task is not to make an independent determination whether the terms of the settlement are fair, adequate and reasonable, but to determine 'only whether the trial court acted within its discretion.' " (*Kullar, supra*, 168 Cal.App.4th at pp. 127–128.) In making this determination, we accord great weight to the trial judge's views. (*7-Eleven Owners for Fair Franchising v. Southland Corp.* (2000) 85 Cal.App.4th 1135, 1145 (*7-Eleven*).) "[G]iven that 'so many imponderables enter into the evaluation of a settlement' [citation], an abuse of discretion standard of appellate review is singularly appropriate." (*Id.* at pp. 1166–1167.)

### 2. Adequacy of Class Relief

As mentioned, defendants agreed to pay a total of $3.5 million to settle the *Volkswagen* action. The settlement agreement provided that $2 million would be allocated to the California SPI subclass (Tier 1), which encompassed the CCPA claims; $800,000 would be allocated to the nationwide SPI subclass

17

(Tier 2); and $700,000 would be allocated to the nationwide PI subclass (Tier 3). All class members could submit a claim for a cash payment. The cash payments for Tiers 1, 2, and 3 were expected to be around $350, $80, and $20, respectively, but those amounts could be adjusted up or down pro rata based on the number of claims submitted. Alternatively, class members whose SPI was exposed in the data breach (so Tiers 1 and 2 only) could make a claim for reimbursement for their out-of-pocket losses up to $5,000.

Wynne contends the trial court erred by granting final approval of the settlement because no information was presented from which the court could analyze the class's "actual damages" and the value of the Tier 2 and Tier 3 claims. Absent evidence supporting the value of those claims, she contends, the court could not independently evaluate the adequacy of the settlement. We conclude the court did not abuse its discretion in finding the settlement fair, reasonable, and adequate.

Courts are not required to ensure that a settlement maximizes the value of released claims with mathematical precision. "[T]he test is not the maximum amount plaintiffs might have obtained at trial on the complaint, but rather whether the settlement is reasonable under all of the circumstances." (*Wershba v. Apple Computer, Inc., supra*, 91 Cal.App.4th at p. 250, disapproved of on another ground by *Hernandez v. Restoration Hardware, Inc.* (2018) 4 Cal.5th 260, 269–270; see also *7-Eleven, supra*, 85 Cal.App.4th at p. 1150 ["the merits of the underlying class claims are not a basis for upsetting the settlement of a class action; the operative word is 'settlement' "].) The relevant circumstances include the strengths and weaknesses of plaintiffs' claims and the risks they faced in litigation. (*7-Eleven*, at p. 1146; see *Linney v. Cellular Alaska Partnership* (9th Cir. 1998) 151 F.3d 1234, 1242 [" 'it is the very uncertainty of outcome in litigation and

18

avoidance of wasteful and expensive litigation that induce consensual settlements. The proposed settlement is not to be judged against a hypothetical or speculative measure of what *might* have been achieved by the negotiators' "].)

To be sure, the trial court must have " 'basic information about the nature and magnitude of the claims in question and the basis for concluding that the consideration being paid for the release of those claims represents a reasonable compromise.' " (*Munoz, supra*, 186 Cal.App.4th at p. 408.) But it does not need to have "an explicit statement of the maximum amount the plaintiff class could recover if it prevailed on all its claims." (*Id.* at p. 409.) No particular type or amount of underlying information is required. All the court was required to have before it was a picture of " ' " 'gross approximations and rough justice.' " ' " (*7-Eleven, supra*, 85 Cal.App.4th at p. 1145.) That was the case here.

Based on declarations submitted by class counsel, the trial court knew the number of class members in each tier and that most of the class—over 3 million—only had their PI exposed (Tier 3). Counsel provided an estimate of the potential value of the CCPA claims based on the maximum statutory damages available under the statute. Though counsel admitted it was difficult to value the common law claims, they explained that the monetary compensation per class member in similar data breach class action settlements ranged from $0.10 to $4.54, while the settlement in this case amounted to $1.10 per class member.[4]

---

[4] Defendants seek judicial notice of 14 different settlements and orders granting final approval, contending the structure and value of those settlements support the trial court's contention that the settlement in this case was fair and reasonable. However, it does not appear from the record that these documents were presented to the trial court, and most of the cases

Class counsel also described in detail the risks the class faced in litigation and the strength and weaknesses of the class claims. They noted potential difficulties in proving causation and damages and in obtaining class certification. They also stated that because the information taken in the data breach about the Tier 3 subclass members was already publicly available or not sensitive personal information, those subclass members would likely not have "any tangible harm or identify theft" as a result of the data breach. Counsel further noted that going to trial would be expensive. Litigating the case would likely occupy several years and pose a significant risk of failure.

Upon the trial court's request, class counsel filed a supplemental declaration clarifying that based on their experience with similar class actions, they predicted the number of claims that would be filed for out-of-pocket expenses and the average amount of the claims.[5] They provided five data breach cases they previously litigated and noted for each case the total number of claims submitted by class members for out-of-pocket expenses and the average amount of those claims. The highest claims rate was 0.000054 percent, while the highest average claim amount was less than $2,500. When applying those numbers to this case, the anticipated total payout for

---

were not mentioned below. We therefore deny defendants' judicial notice request. (See *Weiss v. City of Del Mar* (2019) 39 Cal.App.5th 609, 625 [absent "exceptional circumstances," appellate courts "do not take judicial notice of facts not presented to the trial court"].)

[5] Wynne failed to mention this supplemental declaration in her brief or include it in her appendix. An appellant challenging the sufficiency of the evidence must set forth all the material evidence on point; a brief cannot merely state facts favorable to the appellant. (*Hartt v. County of Los Angeles* (2011) 197 Cal.App.4th 1391, 1402.) Although we do not exercise our discretion to find a waiver of Wynne's claims (see *In re Marriage of Fink* (1979) 25 Cal.3d 877, 887), we note her failure to fulfill her duty to provide a balanced summary of the evidence.

reimbursement claims would be approximately $12,000. The allocation of settlement funds to Tiers 1 and 2 would cover even triple that amount. Counsel further explained that they projected the claims rate for cash payments as 6 percent for Tier 1, 4 percent for Tier 2, and 2 percent for Tier 3.

On filing for final approval of the settlement, class counsel submitted a declaration explaining that the deadline to submit claims had passed and that based on the number of claims submitted, the claims rate was less than 4 percent for Tier 1, less than 3 percent for Tier 2, and approximately 2 percent for Tier 3. Of the claims submitted, 36 sought reimbursement for out of pocket expenses totaling approximately $60,000, though all but one of those claims were "defective." Claimants would have an opportunity to remedy "curable deficiencies." Counsel also noted that there would be remaining settlement funds that would be used to increase the Tier 3 cash payments pro rata.

On this record, the court did not abuse its discretion in granting final approval of the settlement, despite the absence of explicit valuations of actual damages and the Tier 2 and Tier 3 claims. The parties clearly contemplated a claims process whereby the class members with actual financial injuries—above and beyond having their sensitive personal information stolen by hackers—could be compensated for those losses. Without the claims process, it would be unrealistic, if not impossible, to estimate actual damages for a data breach class action of this size. Proof of damages would be in the possession of individual class members, and their injuries could vary greatly. (See *Lane v. Facebook, Inc.* (9th Cir. 2012) 696 F.3d 811, 823.) That only 36 out of approximately 90,000 SPI subclass members made reimbursement claims and that the reimbursement claims totaled approximately $60,000, for

21

an average of about $1,500 per claimant (assuming all reimbursement claims were valid), strongly indicate that the reimbursement cap of $5,000 per class member and the amount of funds allocated to the tiers were reasonable.

The record also demonstrates the potentially low value of the Tier 2 and Tier 3 claims for those class members without financial losses. The common law claims asserted on behalf of those subclass members— negligence, breach of implied contract, and breach of contract—require proof of causation and damages, unlike the CCPA claims encompassed by Tier 1. (See *Artiglio v. Corning Inc.* (1998) 18 Cal.4th 604, 614 [negligence]; *First Commercial Mortgage Co. v. Reece* (2001) 89 Cal.App.4th 731, 745 [breach of contract].) Class counsel explained in their supplemental declaration that these common law claims were "relatively uniform" among the states, "without any state's law providing greater benefits than the others." Thus, for the Tier 2 and Tier 3 subclass members who did not incur out-of-pocket expenses, it is uncertain that they would recover anything more than a nominal amount, if even that. This is especially true for Tier 3, since the record indicates that those subclass members did not have any sensitive personal information exposed in the data breach.

Considering the potentially low value of the non-CCPA claims and the risks, costs, and delays of litigation, the trial court could have reasonably concluded that the cash payments for Tiers 2 and 3 represented a fair compromise for those subclass members that did not have significant financial losses.

Underscoring this conclusion is that data breach class action litigation is a relatively new and still evolving area of litigation, and so the usual risks in litigation are "heightened." (*Carter v. Vivendi Ticketing United States LLC* (C.D.Cal. Oct. 30, 2023, No. SACV 22-01981-CJC (DFMx)) 2023 U.S.Dist.

Lexis 210744, at p. *16.)  As explained by class counsel, no California state or federal data breach class actions have reached a verdict, and " 'damages methodologies in data breach cases are largely untested and have yet to be presented to a jury.' " (*Id.* at p. *17.)  It is therefore difficult to estimate class members' potential recovery.  There is also a significant risk that plaintiffs would be unable to tie their injuries to a particular data breach or obtain class certification, making it impractical for many class members to litigate their individual claims.  (See, e.g., *Vigil v. Muir Medical Group IPA, Inc.* (2022) 84 Cal.App.5th 197, 223 [affirming denial of class certification in data breach action because individualized issues of causation and damages were sufficiently pervasive].)

The settlement in this case removes these risks and secures a settlement now, " 'eliminating the risk that class members would be left without any recovery at all.' " (*Carter v. Vivendi Ticketing United States LLC, supra*, 2023 U.S.Dist. Lexis 210744, at pp. *17–18; see *In re Omnivision Technologies* (N.D.Cal. 2007) 559 F.Supp.2d 1036, 1041–1042 [class action settlement offered an "immediate and certain award" in light of significant obstacles posed through continued litigation].)  The record thus supports the conclusion that the cash payments for Tiers 2 and 3 were a negotiated benefit of settlement to provide *some* form of compensation to those subclass members who did not have appreciable financial losses or a claim for statutory damages, and that the cash payments did in fact provide reasonable consideration.

We further observe that class counsel's estimates of the value of the settlement amounts were generally based on their past experience with data breach class actions.  Their experience and analysis of similar settlements support the reasonableness of the settlement here.  (See, e.g., *Hashemi v.*

23

*Bosley, Inc.* (C.D.Cal. Feb. 22, 2022, No. CV 21-946 PSG (RAOx)) 2022 U.S.Dist. Lexis 119454, at p. *19 [settlement was reasonable "given the ongoing risks and uncertainties of data breach litigation, as well as the fact that the Settlement provides significantly greater value per Class Member as compared to similar data breach class action settlements"]; *Carter v. Vivendi Ticketing US LLC, supra,* 2023 U.S.Dist. Lexis 210744, at pp. *13–14.)

In sum, the "factual record before the [trial] court" was "sufficiently developed to allow the court independently to satisfy itself 'that the consideration being received for the release of the class members' claims [was] reasonable in light of the strengths and weaknesses of the claims and the risks of the particular litigation.' " (*Munoz, supra,* 186 Cal.App.4th at p. 410.) This distinguishes the case from *Kullar*, where *nothing* was presented to the trial court regarding the meal period claims that were added in an amended complaint. (*Kullar, supra,* 168 Cal.App.4th at pp. 121–122, 128–129.) Wynne's reliance on *Clark v. American Residential Services LLC* (2009) 175 Cal.App.4th 785 is similarly misplaced. The record in that case affirmatively demonstrated the court did not independently assess the strengths of the plaintiffs' claims. (*Id.* at pp. 801–802.) We cannot say the same in this case.[6]

---

[6] Wynne raises several issues for the first time in her reply brief, including the inclusion of "clear sailing" provisions in the settlement agreement and plaintiffs' failure to describe in detail the informal discovery they exchanged with defendants prior to mediation. She also contends the trial court erroneously based its *Kullar* analysis on the claims submitted by class members during the claims process rather than on the total claims released. She argues that respondents raised the latter issue in their briefs, but neither defendants nor plaintiffs claimed that a *Kullar* analysis should be based solely on the number of claim forms submitted; rather, they argued that the court had sufficient information regarding the nature and magnitude of the class claims, including their strengths and weaknesses. "It is

Wynne argues the court failed to comply with the Los Angeles Superior Court, Complex Civil Department Checklist for Preliminary Approval of Class Action Settlement. She contends the parties did not provide the court an explanation for why the monetary distribution is fair to each subclass, despite the checklist requiring such an explanation. To the contrary, plaintiffs explained prior to preliminary approval that the settlement amounts allocated to each subclass were based on the strengths and weaknesses of the particular subclass's claims.

Wynne also takes issue with the fact that approximately 57 percent of the settlement deductions would come out of the Tier 1 settlement funds. She acknowledges that the settlement agreement provides that costs are to be allocated " 'proportionately' " among the three subclasses, but she nonetheless contends the allocation of costs was not proportionate because the Tier 1 subclass encompassed less than one percent of the total number of class members. It is clear from the record, however, that the costs allocated to each tier was to be proportionate to the amount of funds allocated to the tiers, and not to the number of class members in each tier. We do not see how it is unfair or unreasonable to allocate 57 percent of the costs to the subclass that holds 57 percent of the settlement funds, and Wynne offers no cogent argument on that point. Absent any salient argument and supporting authorities, Wynne has forfeited this issue. (See *Benach v. County of Los Angeles* (2007) 149 Cal.App.4th 836, 852.)

Therefore, considering the evidence and the record as a whole, the trial court had sufficient information to determine whether the settlement

axiomatic that arguments made for the first time in a reply brief will not be entertained because of the unfairness to the other party" and are forfeited. (*People v. Tully* (2012) 54 Cal.4th 952, 1075.)

amounts were fair and "within the 'ballpark' of reasonableness." (*Kullar, supra,* 168 Cal.App.4th at p. 133.) We thus conclude the court did not err in granting final approval of the settlement, nor did it err in denying Wynne's motion to vacate the resulting judgment.

## III. DISPOSITION

The order denying Wynne's motion to intervene and the order granting final approval of the settlement and entering judgment are affirmed. Respondents are entitled to their costs on appeal. (Cal. Rules of Court, rule 8.278(a)(1), (2).)

LANGHORNE WILSON, J.


WE CONCUR:


BANKE, ACTING P. J.


SIGGINS, J.*


A166931, A168736
*Hajny v. Volkswagen Group f America, Inc.*

---

* Retired Presiding Justice of the Court of Appeal, First Appellate District, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.